# STATE OF MICHIGAN

# COURT OF APPEALS

ANDREW RIEMER,

        Plaintiff-Appellant-Cross-Appellee,

v

CHRISTA JOHNSON,

        Defendant-Appellee-Cross-
        Appellant.

FOR PUBLICATION
August 18, 2015
9:20 a.m.

No. 321057
Manistee Circuit Court
LC No. 11-014312-DC

Before: WILDER, P.J., and SERVITTO and STEPHENS, JJ.

WILDER, P.J..

Plaintiff-appellant-cross-appellee, Andrew Riemer, appeals as of right the trial court's judgment in this custody proceeding and challenges its determinations regarding custody, parenting time, child support, and attorney fees. Defendant-appellee-cross-appellant, Christa Johnson, cross appeals. We affirm.

I

The trial court set forth the following relevant facts in its opinion:

> The parties are the parents of [ARJ], born April 1, 2011, and were never married.
>
> Plaintiff/Father is Dr. Andrew Riemer . . . who is 52 years old. He is an ophthalmologist who owns his own practice, Riemer Eye Care, with four locations. [Plaintiff] lives in Ludington, Michigan, on Hamlin Lake. He was previously married to Lori Riemer, from whom he was divorced in 2004. [Plaintiff] and Lori Riemer have six children who are now all adults.
>
> Defendant/Mother is Dr. Crista [sic] Johnson . . . who is 41 years old. She is a chiropractor who shares ownership in her own practice, Zeller & Johnson, in Manistee. [Defendant] lives in Manistee, Michigan. She was previously married to Eric Ross, from whom she was divorced in 2007. They had no children.

-1-

Plaintiff and Defendant started dating in late 2007 or early 2008. [Defendant] became pregnant three times during her relationship with [plaintiff]. The first pregnancy was in May 2009, which resulted in a miscarriage.

During the time of the relationship between [plaintiff and defendant, plaintiff] fathered a child with Sara Zingery. The child, [AR], was born on July 16, 2009. [Plaintiff] and Ms. Zingery were not married. Legal proceedings as to custody ensued with [plaintiff] and Ms. Zingery agreeing on shared custody of the child, [AR], with the actual sharing of time on a 50/50 basis commencing in the summer of 2013.

Subsequent to the birth of [AR], the relationship continued between [plaintiff] and [defendant] with a second pregnancy occurring, followed by a miscarriage. [Defendant]'s third pregnancy with [plaintiff] occurred thereafter with the child, [ARJ], born on April 1, 2011.[1] An *Acknowledgement of Parentage* was signed, and [plaintiff]'s name appears as the father on the birth certificate.

[Plaintiff] and [defendant] were unable to agree on long-term custody and/or parenting time arrangements, and the custody suit was brought forth by [plaintiff]. Ultimately, the parties' relationship continued to deteriorate with neither marriage occurring nor continuation of their romantic relationship.

The trial court found that the parties' relationship continued to deteriorate after AJR's birth. The trial court found that defendant initially allowed plaintiff parenting time on her own terms and predominately at her home. But after plaintiff was seen with AR in public, defendant was upset and became even more restrictive with plaintiff's parenting time. The parties engaged in mediation resulting in parenting time for plaintiff every Tuesday and Thursday from 6:30 p.m. to 10:00 p.m., and four to six hours every other Friday, Saturday, and Sunday. But then, on September 1, 2011, plaintiff subsequently filed the instant action for custody and parenting time. On February 9, 2012, the trial court entered a temporary order for the same parenting time schedule obtained during mediation and required plaintiff to pay defendant $1,500 per month in child support, effective November 8, 2011. The parties and trial court addressed whether the temporary child support of $1,500 could be modified at the November 8, 2011 hearing. Plaintiff's attorney stated, "I think what the Court first proposed, 1500 ordered to continue until replaced after a review by a different figure." The trial court stated that "neither party is stuck with" the temporary support figure.

While trial was ongoing, on June 18, 2013, the trial court entered another temporary order changing plaintiff's parenting time to every Tuesday and Thursday from 6:30 p.m. to 9:30 p.m., and every other weekend from Friday at 6:00 p.m. to Saturday at 6:00 p.m., and Sunday

---

[1] The trial court found that, when defendant was dealing with pregnancy and despair from her relationship with plaintiff, she struck her belly, screamed at AR, shook AR's carseat, and kicked plaintiff.

from 2:30 p.m. to 8:30 p.m. The trial court also ordered plaintiff to pay defendant $3,000 per month in child support. In its written order, the trial court ruled:

"[d]efendant's request for retroactive application and mandatory child support guideline applicability is reserved; the Court will address final child support amounts or deviation therefrom, and resultant arrearages, if any, consistent with this Court's previous Order of November 8, 2011, when it issues its opinion/order after conclusion of the present evidentiary hearing."

Following approximately 19 days of trial, the trial court entered its January 31, 2014 opinion regarding custody, parenting time, child support, and attorney fees. First, the trial court ruled that ARJ has an established custodial environment with both parents. Then, it determined that factors (a), (b), (e) were equal, factors (c), (j), (k), and (l) favored plaintiff, factor (d) favored defendant, and factors (f), (g), (h), (i) favored neither party. The trial court ordered shared physical custody with gradually increased parenting time for plaintiff "developed over time for a smooth transition towards accomplishing a goal of approximately equal co-parenting time for both parents."[2]

The trial court ordered joint legal custody to plaintiff and defendant. Although it found that defendant's anger toward plaintiff regarding their relationship had previously reduced her willingness to facilitate a close relationship between AJR and plaintiff, the parties nevertheless had satisfactorily resolved important matters affecting the welfare of the child and it was in his best interests for them to share decision-making authority.

In awarding child support, the trial court calculated plaintiff's adjusted gross income as $1,493,481, based on the average adjusted gross income from his tax returns in 2010, 2012, and 2013. The trial court calculated defendant's adjusted gross income as $107,722, based on the average adjusted gross income from her tax returns in 2010 and 2011, noting that in 2012, she had voluntarily reduced her work schedule to care for AJR. From November 1, 2011, to June 15, 2012, the trial court ordered plaintiff to pay defendant $6,229 in child support. From June 15, 2012, to June 18, 2013, the trial court ordered plaintiff to pay defendant $6,807 in child support. From June 18, 2013, to January 31, 2014, the trial court ordered plaintiff to pay defendant $6,804 in child support. From January 31, 2014, to April 1, 2015, the trial court ordered plaintiff to pay defendant $6,204 in child support. From April 1, 2015, to June 1, 2017, the trial court ordered plaintiff to pay defendant $4,511 in child support. After June 1, 2017, the trial court ordered plaintiff to pay defendant $3,012 in child support. The trial court noted that it had intended the temporary orders for child support from February 9, 2012, and June 18, 2013, to be "modifiable

---

[2] From the date of the January 31, 2014 opinion to April 1, 2015, a two-week parenting time schedule awarded plaintiff overnight parenting time on Tuesdays and Thursdays during one week and five hours on Tuesdays and overnight parenting time on Fridays and Saturdays the following week. From April 1, 2015, to June 1, 2017, a two-week parenting time schedule awarded plaintiff overnight parenting time on Tuesdays, Wednesdays, and Thursdays during one week and overnight parenting time on Thursdays, Fridays, and Saturdays the following week. After June 1, 2007, the parties were ordered to alternate custody of ARJ every Friday.

retroactively back to the date of the filing of the motion for support because not all of the information was available at the time." It further noted its statement at the November 8, 2011 hearing that neither party would be "stuck with the support figure."

Finally, the trial court ordered plaintiff to pay a portion of defendant's attorney fees and expenses for expert witnesses under MCR 3.206(C)(2)(a). The trial court ruled that defendant could have been well represented by one attorney at $200 an hour for a total of $186,654 in attorney fees and expert witnesses' expenses of $41,050, for a total of $227,704 to defend the action. From this total, the trial court created what it called a "war chest" of attorney fees and expert costs—multiplying $227,704 by two for each party (totaling $455,408) and assigning responsibility for the war chest based on the parties' combined annual incomes—of which defendant earns 6.7% and plaintiff earns 93.3%. The trial court ordered defendant to pay $30,512 toward the war chest and plaintiff to pay the remaining $424,896 ($197,192 of which would be contributed to defendant's fees). In addition, the trial court ordered defendant to pay any of her fees exceeding $200 an hour and the fees charged by her second attorney, noting that either of defendant's attorneys would have been competent to defend her case, alone.

II

The parties first challenge the trial court's order regarding custody and parenting time.

In child custody disputes, " 'all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of the evidence or committed a palpable abuse of discretion or a clear legal error on a major issue.' " *Dailey v Kloenhamer*, 291 Mich App 660, 664; 811 NW2d 501 (2011), quoting MCL 722.28. Accordingly, the trial court's findings of fact are reviewed under the great weight of the evidence standard, which precludes a reviewing court from substituting its judgment on questions of fact unless they "clearly preponderate in the opposite direction." Under this standard, a court "should review the record in order to determine whether the verdict is so contrary to the great weight of the evidence as to disclose an unwarranted finding, or whether the verdict is so plainly a miscarriage of justice as to call for a new trial . . . ." *Fletcher v Fletcher*, 447 Mich 871, 878; 526 NW2d 889 (1994). Discretionary rulings, including the ultimate award of custody, are reviewed for an abuse of discretion. *Id.* "An abuse of discretion exists when the trial court's decision is palpably and grossly violative of fact and logic[.]" *Dailey v Kloenhamer*, 291 Mich App 660, 664-65; 811 NW2d 501 (2011). Further, clear legal error occurs when the trial court chooses, interprets, or applies the law incorrectly. *Id*. at 881.

Whether an established custodial environment exists is a question of fact to be determined before the trial court makes any custody determination. *Kessler v Kessler*, 295 Mich App 54, 61; 811 NW2d 39 (2011); *Mogle v Scriver*, 241 Mich App 192, 197; 614 NW2d 696 (2000). If an established custodial environment exists, as in this case with both parents, the trial court must find clear and convincing evidence that a change in the established custodial environment is in the child's best interests. *Kessler*, 295 Mich App at 61.

In determining whether a change of custody is in the best interest of a child, the best-interest factors set forth in MCL 722.23 are the appropriate measurement. *LaFleche v Ybarra*, 242 Mich App 692, 700; 619 NW2d 738 (2000). The trial court is required to consider and

-4-

explicitly state its findings and conclusions regarding each best interest factor. *Id*. The best-interest factors set forth in MCL 722.23 are:

> (a) The love, affection, and other emotional ties existing between the parties involved and the child.

> (b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.

> (c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

> (d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

> (e) The permanence, as a family unit, of the existing or proposed custodial home or homes.

> (f) The moral fitness of the parties involved.

> (g) The mental and physical health of the parties involved.

> (h) The home, school, and community record of the child.

> (i) The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference.

> (j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents.

> (k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

> (l) Any other factor considered by the court to be relevant to a particular child custody dispute.

A

On appeal, plaintiff first argues that the trial court's findings regarding factors (b), (d), (f), and (g) were against the great weight of the evidence. We disagree.

Factor (b) requires the trial court to consider the capacity and disposition of the parties involved to give the child love, affection, and guidance, as well as the parties' capacity and disposition to educate and raise the child in his or her religion or creed, if any. MCL 722.23(b). Contrary to plaintiff's claim, there was evidence that both parties had the capacity and

disposition to provide love, affection, and comfort to AJR. The trial court found both parties were professionals with strong educational backgrounds and ties to their religion. The trial court relied on the court-appointed evaluator, Dr. Frank Langer's testimony that both parents were capable of providing excellent care for AJR even though some of their psychological testing results suggested risk factors for both parents regarding attachment, for defendant regarding anger management, and for plaintiff regarding maintaining close relationships. The trial court acknowledged plaintiff's experience raising six successful adult children but also found that, although defendant has only parented AJR, she has done so in a kind, loving, and nurturing manner. Although plaintiff claims that, in considering defendant's ability to give AJR love, affection, and guidance, the trial court did not give adequate weight to defendant's behavior during her pregnancy and instances of dishonesty, plaintiff has not demonstrated that the trial court's finding that defendant had nevertheless been kind, loving, and nurturing subsequent to AJR's birth clearly preponderates in the opposite direction.

Factor (d) requires the trial court to consider the length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity. Here, the trial court found that, although both parents provide a safe, comfortable, secure, and loving environment, AJR had lived with defendant for quantitatively more time than with plaintiff. Plaintiff claims on appeal that, because defendant limited his time with AJR because of the breakdown in the parties' relationship, the trial court's finding that defendant promoted a stable environment was against the great weight of the evidence. The record is clear that defendant was initially restrictive with plaintiff's parenting time, but the record also demonstrates that defendant followed the trial court's temporary orders regarding parenting time and resolved important decisions affecting AJR's welfare with plaintiff. Moreover, the trial court found that, during her time with AJR, defendant demonstrated appropriate, one-on-one caretaking. Plaintiff has not demonstrated that the trial court's findings clearly preponderate in the opposite direction.

Factor (f) requires the trial court to consider the moral fitness of the parties involved. Plaintiff claims the trial court should not have found that defendant's behaviors, including violence during her pregnancy, restrictiveness with parenting time due to jealousy of Zingery and AR, and dishonesty, "did not appear to be a continuation of an element of a shortcoming of moral fitness as to her interaction with or raising of the child." As plaintiff notes, defendant was in counseling to address her anger issues related to plaintiff. Dr. Barbara Edwards did not expect defendant to behave similarly in the future with anyone else. Therefore, the trial court's finding that defendant's behaviors were "situational," or related directly to her despair regarding the demise of her relationship with plaintiff and her pregnancy, did not clearly preponderate in the opposite direction. Moreover, there is evidence in the record that both parties were dishonest on occasion. Therefore, we cannot substitute our judgment regarding the moral fitness of the parties for that of the trial court.

Factor (g) requires the trial court to consider the mental and physical health of the parties involved. The trial court found that plaintiff and defendant were both in good physical health. Again, the trial court relied on Langer's testimony that both parents were capable of providing excellent care for AJR even though some of their psychological testing results suggested "psychological difficulties." Moreover, despite defendant's "previous difficulty with anger management," the trial court relied on Edwards' testimony that defendant was mentally healthy at the time of trial. Edwards credited the change in defendant's mental health to her realization

-6-

that her relationship with plaintiff could not function.[3]  Therefore, the trial court's conclusion that any mental instability defendant had previously demonstrated was specifically attributable to either her relationship with plaintiff or her pregnancy, and did not reflect her current mental health, did not clearly preponderate in the opposite direction.

Plaintiff has not demonstrated that any of the trial court's findings regarding the best interest factors were against the great weight of the evidence.  Even though the trial court found four of the factors weighed in plaintiff's favor and only one factor weighed in defendant's favor, plaintiff has not established that the award of shared physical custody was an abuse of discretion. The "trial court need not make its custody determination on the basis of a mathematical calculation and may assign differing weights to the various best-interest factors." *Berger v Berger*, 277 Mich App 700, 712; 747 NW2d 336 (2008).

B

Both parties challenge the trial court's order regarding parenting time, which gradually adjusted parenting time over the course of approximately three and one-half years and ultimately resulted in equal parenting time.  MCL 722.27a(1) provides:

> Parenting time shall be granted in accordance with the best interests of the child. It is presumed to be in the best interests of a child for the child to have a strong relationship with both of his or her parents. Except as otherwise provided in this section, parenting time shall be granted to a parent in a frequency, duration, and type reasonably calculated to promote a strong relationship between the child and the parent granted parenting time.

Plaintiff challenges the parenting time order, claiming it was based on testimony from Langer that overnights should only be added "when there's a reasonable likelihood that they will be positive experiences for AJR and not occasions of distress for mother."  Plaintiff claims that parenting time should be granted in accordance with the best interests of the child, not on the basis of one parent's distress, and notes testimony from other experts at trial that criticized Langer's opinion focusing on defendant's distress.  The trial court acknowledged the critique of Langer's opinion and, contrary to plaintiff's claim on appeal, did not rely on it when imposing a gradual adjustment to the parenting time schedule.  Rather, the trial court explained the purpose of the gradual adjustment was to allow a "smooth transition" to equal parenting time.  The expert testimony at trial—that it is easier on a child emotionally and cognitively to increase parenting time gradually—supported the trial court's conclusion.  As Dr. Pamela Ludolph testified:

> [Y]ou wouldn't want to change [a child] from one custodial arrangement to a custodial arrangement that's entirely different from whatever that first one was,

---

[3] Although plaintiff points to some testimony from Edwards suggesting she was not aware of all of the interactions defendant had with plaintiff's children in their attempts to integrate her with his older children, there is no testimony in the record that Edwards' opinion regarding defendant's overall mental health at the time of trial changed on the basis of these interactions.

even if the second arrangement was very good in the long run. You would want to do it more slowly so he could ease into it.

Defendant claims that each change to the parenting time schedule ordered to occur after the date of the trial court's January 31, 2014 opinion could not be implemented without proper cause or a change of circumstances demonstrated at a hearing held at the time of the change under MCL 722.27(1)(c), which provides, in relevant part:

> (1) If a child custody dispute has been submitted to the circuit court as an original action under this act or has arisen incidentally from another action in the circuit court or an order or judgment of the circuit court, for the best interests of the child the court may do 1 or more of the following:
>
> * * *
>
> (c) Modify or amend its previous judgments or orders for proper cause shown or because of change of circumstances . . . The court shall not modify or amend its previous judgments or orders or issue a new order so as to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child. The custodial environment of a child is established if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort. The age of the child, the physical environment, and the inclination of the custodian and the child as to permanency of the relationship shall also be considered.

But defendant's reliance on MCL 722.27(1)(c) is misplaced because the gradual changes to the parenting time schedule are contemplated in the January 31, 2014 opinion and they do not "[m]odify or amend" that opinion. Defendant cites no authority for the proposition that the full effect of the parenting time order was required to be implemented immediately. Accordingly, we conclude that the trial court's parenting time schedule was not grossly violative of fact or logic.[4]

C

Defendant argues that the trial court abused its discretion by allowing Dr. Warren Farrell to testify as an expert in father-child relationships in cases of divorce and non-intact families.

---

[4] We reject defendant's claim that the fact that AJR will grow older during the period of time that the gradual changes to the parenting time schedule take effect amounts to a change of circumstances warranting a hearing with every gradual change. Aging is a normal life change and cannot, by itself, constitute "proper cause" and "change of circumstances" under MCL 722.27(1)(c). Otherwise, as every child grew older, there would be proper cause or a change of circumstances to modify a previous parenting time order. *Vodvarka v Grasmeyer*, 259 Mich App 499; 675 NW2d 847 (2003) (normal changes that occur during the life of a child are not sufficient changes of circumstances to modify a custody order).

She claims that Farrell was unqualified to testify under MRE 702 and *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993) because of his background in political science (as opposed to psychology) and she argues that his testimony was unreliable because there was no evidence that his literature review in studies regarding father-child relationships had been peer reviewed, was accepted in the scientific community, or had a known rate of error. But we conclude that, even if the trial court admitted the expert testimony in violation of MRE 702 and *Daubert*, any error was harmless. See *Lewis v LeGrow*, 258 Mich App 175, 199; 670 NW2d 675 (2003) ("A trial court error in admitting or excluding evidence will not merit reversal unless a substantial right of a party is affected . . . and it affirmatively appears that failure to grant relief is inconsistent with substantial justice . . . ."); MCR 2.613(A). Although there was disagreement among the experts at trial regarding Farrell's qualifications and methodology, in its opinion, the trial court only cited Farrell's opinion that fathers have "significant importance" in the lives of children. There was no dispute in the record about that opinion, even by defendant's own expert (Ludolph), who testified that "there are notable positive effects that fathers have on their children and . . . they should be involved in their children's lives in a very real way." Ludolph testified, "[I]t's useful to have a good relationship with both parents if you're a baby . . . ." Ludolph further testified that she agreed with Farrell that children need involvement of both parents and that both parents can serve as an attachment figure with "two, complimentary and necessary functions." She also agreed that each parent needs "substantial parenting time" to foster good relationship. In light of the abundance of testimony regarding the significance of fathers in the lives of children, defendant has not proved that the admission of Farrell's testimony on this point was inconsistent with substantial justice.

III

Next, on appeal, defendant argues that the trial court miscalculated the amount of child support required under the Michigan Child Support Formula (MCSF), while plaintiff argues that the trial court should have deviated downward from the formula and that the trial court improperly modified its first temporary child support order retroactively. We disagree.

"Generally, this Court reviews child support orders and orders modifying support for an abuse of discretion. Whether the trial court properly acted within the child support guidelines is a question of law that this Court reviews de novo. This Court also reviews questions of statutory construction de novo." *Fisher v Fisher*, 276 Mich App 424, 427; 741 NW2d 68 (2007). "Finally, to the extent that the trial court made factual findings in determining the amount of support under the child support formula, those findings are reviewed for clear error." *Borowsky v Borowsky*, 273 Mich App 666, 672; 733 NW2d 71 (2007).

"The formula shall be based upon the needs of the child and the actual resources of each parent." MCL 552.519(3)(a)(vi). A trial court must strictly comply with the requirements of the formula in calculating the parents' support obligations unless it "determines from the facts of the case that application of the child support formula would be unjust or inappropriate . . . ." MCL 552.605(2). This Court, in turn, must ensure compliance with the plain language of the MCSF Manual. *Peterson v Peterson*, 272 Mich App 511, 518, 727 NW2d 393 (2006), quoting *AFSCME v Detroit*, 468 Mich 388, 412; 662 NW2d 695 (2003) (' "We cannot read into the statute what is not there." ').

First, defendant claims that the trial court erred in calculating plaintiff's income for purposes of child support by excluding depreciation taken by plaintiff's LLCs.

MCSF 2.01(E)(4) provides, in relevant part:

(e) Deductions for Taxes. For a variety of historical and policy reasons, the government allows considerable deductions for business-related expenses before taxes are calculated. Those same considerations are not relevant to monies a parent has available for support. Therefore, some deductions should be considered income for purposes of determining child support, unless they are consistent with the nature of the business or occupation, including:

(i) Rent paid by the business to the parent.

(ii) Depreciation.

A parent's income does not include depreciation figured at a straightline (not accelerated) rate on a parent's (not a corporation's or partnership's) tangible personal property other than for vehicles or home offices. Any who use accelerated depreciation for a parent's tangible personal property other than for a vehicle or a home office can claim a deduction for the straight-line amount if the parent provides proof of what the straight-line amounts would have been.

(iii) Home office expenses, including rent, hazard insurance, utilities, repairs, and maintenance.

(iv) Entertainment expenses spent by the parent. Legitimate expenses for customer's entertainment are allowable as deductions.

(v) Travel expense reimbursements, except where such expenses are inherent in the nature of the business or occupation (e.g., a traveling salesperson), and do not exceed the standard rates allowed by the state of Michigan for employee travel.

(vi) Personal automobile repair and maintenance expenses.

Depreciation is one of the deductions that the MCSF expressly provides should be included in a parent's income even though it is excluded from income for tax purposes. But the formula limits this inclusion in income by providing, "some deductions should be considered income for purposes of determining child support, unless they are consistent with the nature of the business or occupation." Defendant has not demonstrated that the trial court's finding that "there is no indication the depreciation is not a legitimate reality to the nature of the business" was clearly erroneous.[5] Moreover, we reject defendant's claim that deprecation is merely

_____

[5] Defendant claims that all depreciation is, by definition, used in a business and argues that, under the trial court's interpretation, depreciation could never be included in a parent's income

-10-

"theoretical" and should have been included in income to fully understand plaintiff's actual resources. See MCL 552.519(3)(a)(vi). Although an accountant testified at trial that depreciation does not necessarily affect cash flow, it nevertheless affects a parent's resources. *Random House Webster's College Dictionary* (2001) defines depreciation as "a decrease in value due to wear and tear, decline in price, etc." Here, the trial court found the decrease in value to the business property, according to the Schedule Es, was $276,163 for 2010, $313,737 for 2011, and $284,955 for 2012. The trial court did not err in calculating plaintiff's income and excluding depreciation taken by plaintiff's LLCs because it was consistent with the nature of plaintiff's businesses.

Second, defendant claims that certain income deductions taken in plaintiff's 2009 tax return should have been considered when calculating plaintiff's income for purposes of child support. But to calculate child support, the trial court considered the average of plaintiff's income for 2010, 2012, and 2013. Defendant does not explain why income deductions plaintiff took in 2009 are relevant to the average of the income plaintiff received between 2010 and 2013. "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *People v Kevorkian*, 248 Mich App 373, 389; 639 NW2d 291 (2001). Defendant's failure to properly address the merits of her assertion of error constitutes abandonment of the issue. *Houghton ex rel Johnson v Keller*, 256 Mich App 336, 339-340; 662 NW2d 854 (2003).

Plaintiff argues that the trial court abused its discretion by failing to deviate downward from the MCSF. We disagree.

MCL 552.605(2) provides:

(2) Except as otherwise provided in this section, the court shall order child support in an amount determined by application of the child support formula developed by the state friend of the court bureau as required in section 19 of the friend of the court act, MCL 552.519. The court may enter an order that deviates from the formula if the court determines from the facts of the case that application of the child support formula would be unjust or inappropriate and sets forth in writing or on the record all of the following:

(a) The child support amount determined by application of the child support formula.

(b) How the child support order deviates from the child support formula.

_____

and MCSF 2.01(E)(4)(ii) would be rendered nugatory. But it is not inconceivable that a parent could claim a depreciation deduction on an income tax return for property used in a business that is not actually consistent with the nature of the business or occupation. Such an inconsistency would have to be established on the record, but as the trial court found, has not been established here.

(c) The value of property or other support awarded instead of the payment of child support, if applicable.

(d) The reasons why application of the child support formula would be unjust or inappropriate in the case.

Plaintiff claims the child support award provides more than an amount that is necessary for AJR's care and maintenance and constitutes de facto alimony for defendant. But our Supreme Court has explained that the formula incorporates both a child's needs and the resources of the parents. *Burba v Burba*, 461 Mich 637, 648; 610 NW2d 873 (2000). "Parents' incomes are accounted for when child support levels are set because they are one of the factors used in the formula, and the formula sets exact support levels on the basis of parents' incomes, including parents whose incomes are disparate." *Id.*

MCSF 1.04(E) provides a list of situations that may cause strict application of the formula to be unjust or inappropriate. The trial court found that MCSF 1.04(E)(17) ("A parent provides a substantial amount of a child's day-time care and directly contributes toward a significantly greater share of the child's costs than those reflected by the overnights used to calculate the offset for parental time.") applied, but would be de minimus. Plaintiff does not challenge that finding as clearly erroneous on appeal. Rather, plaintiff challenges the trial court's finding that none of the other situations listed in MCSF 1.04(E) applied. Plaintiff claims a downward deviation was warranted under MCSF 1.04(E)(9) ("A parent earns an income of a magnitude not fully taken into consideration by the formula."). But plaintiff's reliance on MCSF 1.04(E)(9) is misplaced because he does not argue that his income was not fully taken into consideration by the formula, as the plain language of the deviation factor requires. Instead, plaintiff claims his income was fully taken into consideration by the formula and should not have been because he earns so much. We cannot read into the MCSF Manual a deviation factor that is not there. See *Peterson*, 272 Mich App at 518.[6]

Last, plaintiff argues that the trial court's February 9, 2012 order, which required plaintiff to pay child support of $1,500 effective November 8, 2011, was improperly modified retroactively by the trial court's January 31, 2014 opinion. Plaintiff relies on MCR 3.207(C)(4), which provides, "A temporary order must state its effective date and whether its provisions may be modified retroactively by a subsequent order." In its January 31, 2014 opinion, the trial court acknowledged that its written February 9, 2012 order "did not address retroactivity." The trial court nevertheless ruled that it was its intent, at that time, for any temporary orders to be

---

[6] We note that plaintiff's reliance on *Kalter v Kalter*, 155 Mich App 99, 104 (1986) and *In re Marriage of Patterson*, 22 Kan App 2d 522; 920 P2d 450 (1996) is misplaced because these cases are not binding precedent under MCR 7.215(J)(1) and *A & E Parking v Detroit Metro Wayne Co Airport Auth*, 271 Mich App 641, 645; 723 NW2d 223 (2006). We also note that defendant claims, by failing to include plaintiff's depreciation allowance from his Schedule Es and some of his 2009 deductions, the trial court effectively deviated from the MCSF and failed to satisfy the written requirements of MCL 552.605(2)(a) through (d). But we concluded earlier that defendant has not established that the trial court erred in calculating plaintiff's income.

modifiable retroactively. We conclude that, not only was it clear that the trial court intended temporary orders to be modifiable retroactively, it was clear from the plaintiff counsel's statements at the November 8, 2011 hearing that this intention was understood. By recording its intent regarding retroactivity in its written January 31, 2014 opinion, the trial court satisfied, nunc pro tunc, the retroactivity requirement of MCR 3.207(C)(4). See *Sleboede v Sleboede*, 384 Mich 555, 558-559; 184 NW2d 923 (1971) ("The function of such an order is to supply an *omission in the record* of action previously taken by the court but not properly recorded.").

IV

On appeal, both parties challenge the trial court's award of attorney fees.[7] Plaintiff asserts some entitlement to attorney fees on the basis that defendant's misconduct protracted the proceedings and increased the costs of litigation. However, plaintiff did not file a motion requesting attorney fees in the lower court. As such, any consideration whether plaintiff was entitled to attorney fees on the basis of defendant's conduct is unpreserved and we decline to address it. See *King v Michigan State Police Dept*, 303 Mich App 162, 185; 841 NW2d 914 (2013).

Defendant argues that, after the trial court determined she was entitled to attorney fees under MCR 3.206(C)(2)(a)[8], the trial court erred when it failed to determine the amount of fees to be awarded by following in detail the procedure outlined in *Smith v Khouri*, 481 Mich 519, 530-531; 751 NW2d 472 (2008). We disagree. In *Smith*, the Supreme Court "review[ed] a trial court's award of "reasonable" attorney fees *as part of case-evaluation sanctions under MCR 2.403(O)*." 481 Mich at 522 (emphasis added). The Supreme Court noted that "[t]he purpose of [MCR 2.403(O)] is to encourage the parties to seriously consider the evaluation and provide financial penalties to the party that, as it develops, "should" have accepted but did not. *Id.* at 527-528. In contrast, as is apparent from the language of the court rule, the purposes for awarding attorney fees under MCR 3.206(C)(2) are: 1) to assist a party who is unable to bear the

---

[7] The parties' challenges on appeal are limited to the award of attorney fees and they do not challenge the award for experts' expenses under MCR 3.206(C).

[8] MCR 3.206(C) provides:

> (1) A party may, at any time, request that the court order the other party to pay all or part of the attorney fees and expenses related to the action or a specific proceeding, including a post-judgment proceeding.

> (2) A party who requests attorney fees and expenses must allege facts sufficient to show that

> (a) the party is unable to bear the expense of the action, and that the other party is able to pay, or

> (b) the attorney fees and expenses were incurred because the other party refused to comply with a previous court order, despite having the ability to comply.

-13-

expense of the action, when it is also determined that the other party is able to pay the first party's fees; and 2) to reimburse a party for attorney fees incurred when that party has sought to enforce an order which the other party is able, but fails, to comply with.[9]  Because the purposes of an award of attorney fees under MCR 3.206(C)(2) have no relation to the purposes for attorney fees awarded under MCR 2.403(O), we conclude that the trial court did not err in failing to follow the detailed procedure set forth in *Smith*.  See *Univ Rehabilitation Alliance, Inc v Farm Bureau Gen Ins Co of Mich*, 279 Mich App 691, 700 n 3; 760 NW2d 574 (2008); *FMB-First Mich Bank v Bailey*, 232 Mich App 711, 722-23; 591 NW2d 676 (1998).

In determining whether trial court's award of attorney fees under MCR 3.206(C)(2) was unreasonable, we review the trial court's findings of fact for clear error, *Solution Source, Inc v LPR Associates Ltd Partnership*, 252 Mich App 368, 381; 652 NW2d 474 (2002), and the determination of the reasonableness of the fees for an abuse of discretion, *Bolt v City of Lansing (On Remand)*, 238 Mich App 37, 61; 604 NW2d 745 (1999).  "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004).  A trial court does not abuse its discretion when it chooses an outcome within the range of reasonable and principled outcomes. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006).

The trial court relied on MRPC 1.5(a) and the factors articulated in *Wood v Detroit Auto Inter-Ins Exch*, 413 Mich 573, 588; 321 NW2d 653 (1982), in determining the amount of attorney fees to be awarded to defendant.  MRPC 1.5(a) provides:

> The factors to be considered in determining the reasonableness of a fee include the following:
>
> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;

---

[9] As recently clarified by this Court in *Richards v Richards*, ___ Mich App ___, ___; ___ NW2d ___ (2015) (Docket No. 319753), slip op at 9, "MCR 3.206(C)(2) provides two independent bases for awarding attorney fees and expenses."

-14-

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

The six additional *Wood* factors are: "(1) the professional standing and experience of the attorney; (2) the skill, time and labor involved; (3) the amount in question and the results achieved; (4) the difficulty of the case; (5) the expenses incurred; and (6) the nature and length of the professional relationship with the client." *Wood*, 413 Mich at 588 (quotation marks and citation omitted).

In its opinion, the trial court first analyzed the MRPC 1.5(a) factors. Regarding factor (1), the trial court found that the issues were limited to custody, parenting time, child support, and attorney fee contribution. While the issues were not unusual and many competent attorneys in the area could handle them, the trial court noted that the case was time-intensive—involving 19 days of trial, over 100 exhibits from each party, and several expert witnesses.

Regarding factor (2), the trial court found that, even though the case was time-consuming, the attorneys for both parties—Eric Phelps and an associate for plaintiff, and Keldon Scott and Mark Quinn for defendant—had active law practices and this case did not noticeably preclude other employment.

Regarding factor (3), the trial court listed the mean hourly rate for attorneys in the circuit ($175), in Lansing (where Scott practices) ($221), and among family law practitioners in Michigan ($199).

Regarding factor (4), the trial court found that while custody and child support are important to the parties, this factor is better suited to evaluating the amount at issue and actually awarded in a civil lawsuit seeking the recovery of damages.

Regarding factor (5), the trial court found that no time limitations were imposed in the case.

Regarding factor (6), the trial court found that defendant and her attorney had no relationship prior to the case.

Regarding factor (7), the trial court found that the parties' attorneys were well-qualified and represented the parties well.

Finally, regarding factor (8), the trial court found that attorney fees were "hourly based upon the amount of time spent."

After analyzing the factors, the trial court noted the hourly rates of each attorney, i.e., Phelps ($200), Phelps's associate ($175), Quinn ($200), and Scott ($325), listed the amounts charged by the attorneys through August 31, 2013, and estimated the fees that were incurred afterwards. The trial court further ruled that defendant could have been well represented by one attorney at $200 an hour for a total of $186,654, and also concluded that reasonable expert witnesses fees were in the amount of $41,050, for a total of $227,704 to be awarded to defendant

in order for her to bear the expense of defending the action. Then, as we have previously explained, the trial court ordered the creation of a so-called "war chest" totaling $455,408 (double the amount awarded to defendant), through payments to be made by the parties in proportion to their annual incomes.

Defendant challenges the reasonableness of the attorney-fee portion of this award, arguing that she was disadvantaged because plaintiff incurred for his own attorney fees nearly double the amount she was awarded by the trial court to pay her attorneys. But in its consideration of MRPC 1.5(a)(1), the trial court expressly considered resources required given the "time-intensive" nature of the proceedings, and it ultimately concluded that defendant could have been well represented by one attorney at $200 an hour for a total of $186,654. Defendant has failed to establish that the trial court's conclusion was outside the range of principled outcomes. *Maldonado*, 476 Mich at 388.

Affirmed. No costs, as neither of the parties prevailed in full. MCR 7.219.

/s/ Kurtis T. Wilder
/s/ Deborah A. Servitto
/s/ Cynthia Diane Stephens

-16-