*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DANIELLE J. CAMPBELL, also known as
DANIELLE JOY POSTMA,

UNPUBLISHED
June 16, 2026
11:31 AM

Plaintiff/Counterdefendant-Appellee,

V

No. 379064
Kent Circuit Court
LC No. 24-010936-DM

ALEXANDER K. CAMPBELL,

Defendant/Counterplaintiff-Appellant.

Before: REDFORD, P.J., and WALLACE and LIEVENSE, JJ.

PER CURIAM.

Defendant appeals as of right the judgment of divorce from plaintiff which awarded the parties joint legal custody and plaintiff physical custody of their biological children EJC and MJC. Defendant argues that the trial court clearly erred by finding that the children's established custodial environment was with plaintiff and by finding that defendant failed to show by clear and convincing evidence that a change in the children's established custodial environment was in their best interests. For the reasons set forth in this opinion, we affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff and defendant married in May 2021 and EJC was born in late 2022. EJC was almost two years old when these proceedings began in late 2024, and MJC was born a few months later, in early 2025.

In July 2024, the parties began attending marriage counseling. In August 2024, defendant began a romantic relationship with a coworker and did not tell plaintiff or their therapist. In September 2024, their therapist came up with a separation arrangement while still unaware of defendant's ongoing extramarital affair. In November 2024, when plaintiff was seven months pregnant with MJC, she discovered defendant's affair. She moved for separate maintenance on November 1, 2024, requesting that she "be awarded physical custody of the minor children with the parties sharing legal custody." Plaintiff also moved for a temporary order, requesting physical custody of EJC and proposing a parenting-time schedule for defendant. Also in November 2024, defendant filed a countercomplaint for divorce. On November 26, 2024, the trial court granted

plaintiff's motion and set a parenting time schedule wherein defendant was ordered to vacate the marital home but was granted parenting time with EJC on alternating weekends and Wednesday afternoons.

In December 2024, defendant moved for reconsideration of the trial court's order, arguing the trial court committed legal error by altering EJC's established custodial environment without determining first whether it was in her best interests. The trial court granted the motion and scheduled an evidentiary hearing. In early 2025, shortly after MJC was born, defendant moved to establish parenting time with MJC. Then, in February 2025, the trial court issued an amended interim temporary order granting defendant parenting time with MJC.

In March 2025, the trial court held an evidentiary hearing to determine the established custodial environment for the children.[1] The testimony presented at the evidentiary hearings conflicted. Plaintiff took four months of maternity leave after EJC was born and subsequently returned to work as a physical therapist part-time. Defendant, a corporate attorney, testified that he took two weeks off and "then kind of eased back in . . . ." He affirmed that, most of the time, he "preferred to go to the office to work, as opposed to working remotely." Defendant testified he cared for EJC in her infancy by changing "a lot of diapers, held her a lot. Helped get her down for naps and bedtimes, and started giving the bottles pretty early on so that [plaintiff] could get to bed at a better time, be less tethered with . . . the nursing schedule . . . ."

Plaintiff breastfed EJC for one year and was primarily responsible for EJC's nighttime care. She testified that, although defendant took time off work, he did not assist her "very much" and that defendant "said that he was bored, and that I did everything," "so he wanted to return to work." Plaintiff testified "it was kind of normal that he worked a lot . . ." and she "did do everything for [EJC]." However, plaintiff could not "remember one time that [defendant] got up in the middle of the night [to assist with EJC's care]," and when she asked defendant to help with "middle of the night wakeups" during EJC's first few days, "he was so upset that I asked him to help, that I woke him up. And so, I didn't ask again." Regarding childcare, plaintiff solely interviewed and selected EJC's nanny and "there was no involvement of [defendant] in that at all." Plaintiff testified that EJC had 35 medical appointments "in the first two years of her life. I took her to 34. [Defendant] attended 3, and the nanny took her to 1 . . . ."

---

[1] There were several delays in scheduling and holding the evidentiary hearing. One reason was that both parties agreed to wait for the report and recommendation from Kent County Friend of Court (FOC) mediator and evaluator assigned to the case as to the established custodial environment. In addition, following two adjournments, defendant moved for immediate consideration and appealed by delayed leave, requesting that this Court reverse the trial court's November 2024 order and direct the trial court to hold the evidentiary hearing as originally scheduled. In *Danielle J Campbell v Alexander K Campbell*, unpublished order of the Court of Appeals, entered March 13, 2025 (Docket No. 374649), this Court granted father's motion for immediate consideration and remanded the matter to the trial court to hold an evidentiary hearing, specifying "the provisions of the November 26, 2024 order control unless and until the trial court modifies those provisions after a proper assessment of the merits of the parties' positions."

The nanny testified she cared for EJC from 8:30 a.m. to 6:00 p.m. or 6:30 p.m. three days a week, and plaintiff contacted the nanny "at least once an hour, once every two hours, about what we were doing. How [EJC] was doing, what she ate for lunch." EJC talked about plaintiff "every single day, it's mama reads books. Mama plays with me. Mama brought me to the park. Mama takes care of [MJC]. Mama does this. Mama does that." Plaintiff was EJC's "comfort person. She—if EJC's upset, it's always about her mama. Like, she wants her mama." When asked whether EJC talked about defendant at all, or whether EJC talked about defendant the way she talked about plaintiff, the nanny testified "No." The nanny also observed that EJC was "beyond excited when her mom would get home, and [plaintiff] would be just as excited. She would run through the door, lay on the floor, get on her level, play with her." However, EJC "seemed very indifferent" when defendant returned home and one time, EJC started crying when the nanny handed her off to defendant, which the nanny thought was "extremely strange."

The trial court issued an order in April 2025, stating that "[i]t is undisputed that MJC's custodial environment is with [plaintiff]" and that EJC's established custodial environment was also with plaintiff, "with elements of a joint custodial environment beginning to develop in the months immediately preceding separation" of the parties.

In June 2025, the parties agreed to a new expanded parenting-time schedule. In July 2025, the trial court held a bench trial to determine custody, parenting time, and related issues for both children. The trial testimony addressed certain best-interest factors as set forth in MCL 722.23. The FOC testified as to the contents of her report and how she weighed certain best-interest factors for or against each party.

In September 2025, the trial court issued its opinion and order determining whether EJC's and MJC's "custodial environments have changed between the April 16, 2025, determination and the July 29, 2025, trial date." The trial court found that although defendant presented evidence that his involvement with the children increased, "both children's established custodial environments have remained with [plaintiff] and have not materially changed since this Court's April 2025 determination," because plaintiff remained the children's primary source of guidance, comfort, discipline, and the necessities of life. The trial court also analyzed each of the best-interest factors under MCL 722.23 in making a best-interest determination and held that defendant "has not met the clear and convincing evidence standard required to alter the children's established custodial environment." The court awarded the parties joint legal custody and awarded plaintiff primary physical custody. In December 2025, the trial court issued its judgment of divorce. Defendant now appeals.

## II. STANDARD OF REVIEW

Under the Child Custody Act, MCL 722.21 *et seq*., "all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue." MCL 722.28. See also *Pierron v Pierron*, 486 Mich 81, 85; 782 NW2d 480 (2010). "A finding of fact is against the great weight of the evidence if the evidence clearly preponderates in the opposite direction." *Pennington v Pennington*, 329 Mich App 562, 570; 944 NW2d 131 (2019) (citation omitted). As such, the trial court's findings "regarding the existence of an established custodial environment and regarding each custody factor should be affirmed unless the evidence

clearly preponderates in the opposite direction." *Id*. (quotation marks and citation omitted). "When a court incorrectly chooses, interprets, or applies the law, it commits legal error that the appellate court is bound to correct." *Fletcher v Fletcher*, 447 Mich 871, 881; 526 NW2d 889 (1994).

## III.  ESTABLISHED CUSTODIAL ENVIRONMENT

Defendant argues that the trial court's established-custodial-environment finding was against the great weight of the evidence because the trial court failed to consider up-to-date information from between November 2024 and March 2025 when initially deciding the children's established custodial environment was with plaintiff, and only considered new evidence from April 2025 to July 2025 when determining whether the children's established custodial environment changed between April 2025 and July 2025.  We disagree.

## A.  WHETHER THE TRIAL COURT CONSIDERED THE CORRECT TIME FRAMES WHEN DECIDING THE CHILDREN'S ESTABLISHED CUSTODIAL ENVIRONMENT

Defendant contends that if the trial court had considered evidence from between November 2024 and March 2025 when making its initial established-custodial-environment determination, it would have determined that it was with both parties, which would have changed defendant's burden of proof at trial.

Defendant's argument lacks merit.  "A trial court is required to determine whether there is an established custodial environment with one or both parents before making *any* custody determination." *Kessler v Kessler*, 295 Mich App 54, 61; 811 NW2d 39 (2011).  "Whether an established custodial environment exists dictates the evidentiary burden applicable to the parent seeking to alter a child's environment." *Kuebler v Kuebler*, 346 Mich App 633, 670; 13 NW3d 339 (2023).  "[W]hen an established custodial environment does exist, a court is not to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child." *Id*. (quotation marks and citation omitted).

Contrary to defendant's position on appeal, at the evidentiary hearing defendant objected to evidence from after November 2024, including the February 2025 FOC report, because he believed the evidentiary hearing should have occurred in November 2024.  Defendant's counsel conceded as much at oral argument.  And, per the directive in this Court's March 2025 order that the November 26, 2024 parenting time order controlled,[2] the trial court sustained the objection and excluded the FOC report from its consideration of the children's established custodial environment.  Even without considering the FOC report, the trial court still concluded that it was with plaintiff.  This evidentiary ruling by the trial court comports with our Supreme Court's holding in *Sabatine v Sabatine*, 513 Mich 276, 287; 15 NW3d 204 (2024), that "where the preseparation custodial environment no longer exists, the relevant point in time for purposes of

---

[2] See *Danielle J Campbell v Alexander K Campbell*, unpublished order of the Court of Appeals, entered March 13, 2025 (Docket No. 374649).

determining whether an established custodial environment exists is at the time the trial court makes its custody determination."

Defendant's argument that the trial court erred when it only considered evidence from April 2025 to July 2025 (and failed to consider evidence from November 2024 to March 2025) when deciding in the divorce judgment whether the established custodial environment changed also fails. At the very least, the FOC report was admitted at trial and included evidence from November 2024 (after the parties' separation) to February 2025 (the report date), it concluded that an established custodial environment existed with plaintiff, and the FOC evaluator and other witnesses testified about the November 2024 to March 2025 period. The trial court considered the available exhibits and testimony and concluded that both children had an established custodial environment with plaintiff, so the contested time frame was considered. Thus, both arguments lack merit.

### B. THE TRIAL COURT'S ESTABLISHED-CUSTODIAL-ENVIRONMENT FINDINGS WERE NOT AGAINST THE GREAT WEIGHT OF THE EVIDENCE

Defendant next argues the trial court was presented with "an abundance of evidence at the July 2025 divorce hearing regarding the fact that the children looked to [him] for parental support and guidance during his parenting time." He maintains the evidence created an established custodial environment with him as well, and the trial court's determination that it remained only with plaintiff was against the great weight of the evidence.

A custodial environment is:

> established if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort. The age of the child, the physical environment, and the inclination of the custodian and the child as to permanency of the relationship shall also be considered. [MCL 722.27(1)(c).]

Whether an established custodial environment exists "is an intense factual inquiry." *Foskett v Foskett*, 247 Mich App 1, 6; 634 NW2d 363 (2001). We have held that the established custodial environment "is one of significant duration" in which a parent provides care "appropriate to the age and individual needs of the child." *Berger v Berger*, 277 Mich App 700, 706; 747 NW2d 336 (2008). It is "both a physical and a psychological environment that fosters a relationship between custodian and child and is marked by security, stability, and permanence." *Id*. "An established custodial environment may exist with both parents where a child looks to both the mother and the father for guidance, discipline, the necessities of life, and parental comfort." *Id*. at 707.

In *Sabatine*, 513 Mich at 290, our Supreme Court addressed "whether a modification to parenting time altered the children's established custodial environments." The Court held that "[n]ot all modifications to parenting time will automatically constitute a change in custody." *Id*. The relevant question is "whether the modification to parenting time will change whom the child naturally looks to for guidance, discipline, the necessities of life, and parental comfort[.]" *Id*. at 291 (quotation marks and citation omitted). Additionally, "[a]lthough the 'physical environment' of the children is to be considered in determining a child's established custodial environment, it is not the only factor, and it is not alone dispositive." *Sabatine*, 513 Mich at 293,

quoting MCL 722.27(1)(c). A child's established custodial environment is not "a simple math equation that could be answered by looking at the number of overnights the children spend with each parent." *Id*.

While defendant increased his involvement with EJC and MJC between November 2024 and the July 2025 bench trial, the trial court's findings that the children's established custodial environment remained with plaintiff was not against the great weight of the evidence. The trial court correctly acknowledged under *Sabatine*, 513 Mich at 291-293, that parenting time schedules alone do not alter an established custodial environment. At the bench trial, plaintiff testified extensively regarding her attention to giving guidance and discipline to both children by teaching them to care for themselves independently, behave properly, speak, and play.

Plaintiff also described her organization of EJC and MJC's morning routines in great detail. She testified that she coordinates MJC's feeding times and prepares breast milk in bottles when defendant has parenting time with MJC. She testified that she asks extensive questions at the children's doctor's appointments and is engaged. And she detailed the physical care she provides the children, including caring for them throughout the night, cleaning their ears and noses, trimming their nails, and administering vitamin D drops. Against this backdrop, the trial court's decision was not against the great weight of the evidence.

Defendant relies on *Kuebler*, 346 Mich App 633, to argue that because he provides guidance and comfort to the children and the children look to him for parental support, the trial court should have found a joint established custodial environment.

In *Kuebler*, following the parties' divorce, the father received sole physical and legal custody of the parties' children, and the mother received supervised parenting time. *Id*. at 643-644. The mother appealed, seeking joint legal and joint physical custody, and this Court denied relief, reasoning that the supervised parenting-time arrangement was warranted given the mother's behavior of fabricating allegations of child abuse against the father. *Id*. at 646 (citation omitted).

After remand, and the mother's motion in the trial court seeking joint physical and legal custody, an evidentiary hearing was held. *Id*. at 647, 650. The mother presented evidence that "for more than a year, in compliance with the parties' stipulations, [she] had exercised more expansive parenting time with the children, including overnight visits, without incident and without fabricating allegations against [the father]," the mother was granted joint legal custody and additional parenting time. *Id*. at 650-651. The father appealed, arguing that "the trial court's conclusion that the children have an established custodial environment with both parents was against the great weight of the evidence." *Id*. at 667. This Court disagreed, finding that, in accordance with MCL 722.27(1)(c), the mother "provided testimony about her parenting-time visits to support that she provides for their necessities while they are with her, that she disciplines them, and that she provides guidance and comfort." *Id*. at 679.

Unlike here, however, the mother in *Kuebler* had exercised more expansive parenting time with her children "for more than a year . . . including overnight visits, without incident . . . ." *Id*. at 651. Conversely, here the proceedings began in November 2024, the order regarding custody and parenting time was issued in September 2025 (less than a year later), and the parties' new expanded parenting-time schedule only began in June 2025, a month before the July 2025 trial.

Also, trial testimony demonstrated that the expanded parenting time was not without incident, as set forth in the record.

Finally, defendant argues the trial court erroneously faulted him for his full-time employment when deciding the children's established custodial environment was with plaintiff, relying on *Bofysil v Bofysil*, 332 Mich App 232, 244; 956 NW2d 544 (2020). In that case, the parties agreed that the appellee would stay home to raise the child while the appellant worked outside the home. When the parties filed for divorce, the trial court awarded sole legal and physical custody to the appellee, and parenting time to appellant, finding the child's established custodial environment was with the appellee alone. *Id*. at 235-236, 239. The trial court reasoned that because the appellee was "the stay at home mom while the parties were together and she has had primary physical custody continuously since they separated," and the child was with the appellee "the majority of the time," an established custodial environment existed with [the appellee]." *Id*. at 239. This Court vacated the custody award and remanded for further consideration, holding that the trial court erroneously faulted "[the appellant] for her full-time employment outside the home by treating her as less than a full parent." *Id*. at 244.

In the present case, however, the trial court's September 2025 opinion and order only once considered defendant's full-time employment as a factor to determine custody: when the trial court addressed defendant's low attendance at the children's medical appointments, acknowledging in defendant's *favor* that "before separation, the parties agreed that [plaintiff] would stay home two days per week while [defendant] worked full-time, which naturally resulted in [plaintiff] handling more medical appointments during business hours." The trial court noted that defendant's "pattern of limited engagement, even when present at appointments," was what raised concerns about defendant's "disposition to participate in medical care," not his full-time employment. The trial court did not fault defendant for his full-time employment or treat him "as less than a full parent." *Id*. at 244. In fact, the trial court acknowledged the "evidence of [defendant's] increased involvement with the children since the filing of this case," his increased attendance at the children's medical appointments, and his "steady employment" which provides health insurance for the family.

The evidence showed that defendant provided care and support for the children—including food, clothing, and health insurance for the children through his employment—and participated in activities with the children when they were in his care. But the trial court's extensive consideration of the testimony (plaintiff, defendant, nanny, and FOC) resulted in a finding that an established custodial environment existed with plaintiff only. And defendant has failed to demonstrate that the evidence clearly preponderates in the opposite direction. *Pennington*, 329 Mich App at 570. Defendant is not entitled to remand regarding this issue. See *Pierron*, 486 Mich at 85.

IV. BEST-INTEREST FINDINGS

Defendant challenges the trial court's determination as to best-interest factors MCL 722.23(b), (c), (f), and (j).

As stated earlier, we affirm all orders and judgments of the circuit court "unless the trial judge made findings of fact against the great weight of evidence." MCL 722.28. "If an established custodial environment exists with either or both parents, the trial court must find clear and

convincing evidence that a change in the established custodial environment is in the child's best interests." *Riemer v Johnson*, 311 Mich App 632, 641; 876 NW2d 279 (2015). Because defendant's request for equal physical custody would alter the established custodial environment, "[t]he court shall not modify or amend its previous judgments or orders or issue a new order so as to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child." MCL 722.27(1)(c). "In determining whether a change of custody is in the best interests of a child, the best-interest factors set forth in MCL 722.23 are the appropriate measurement." *Riemer*, 311 Mich App at 642. The trial court "may assign differing weights" to the best-interest factors. *Id*. at 645-646.

Under MCL 722.23(b), courts consider "[t]he capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any." The trial court found this factor in favor of plaintiff, stating that "the weight of the evidence establishes that [plaintiff] has demonstrated superior capacity in providing guidance and continuing education appropriate to the children's developmental stages."

Under MCL 722.23(c), courts consider "[t]he capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs." The trial court also found this factor favored plaintiff, stating that, "[r]egarding medical care, the evidence reveals a significant disparity in involvement," and that "even when attending appointments, [defendant] admitted that his participation is limited." This "pattern of limited engagement, even when present at appointments, raises concerns about [defendant's] disposition to participate in medical care beyond financial provision actively . . . ."

Regarding both factors, defendant disagrees, arguing that he was faulted for his full-time work schedule (particularly as to medical appointment attendance) and that the trial evidence demonstrates that he is capable of providing, and has provided, the children with love, affection, and guidance. However, as mentioned above, the trial court stated defendant's "limited engagement" and "disposition" were what mattered, not his employment.

> The Court acknowledges that before separation, the parties agreed that [plaintiff] would stay home two days per week while [defendant] worked full-time, which naturally resulted in [plaintiff] handling more medical appointments during business hours. However, the pattern of limited engagement, even when present at appointments, raises concerns about [defendant's] disposition to participate in medical care beyond financial provision actively.

The FOC testified similarly that parents working full-time are evaluated on their availability, capacity, and disposition, not solely on their employment status. The trial court acknowledged that defendant was capable of and has provided the children with love, affection, and guidance, but ultimately held that plaintiff demonstrated "superior capacity." *Pennington*, 329 Mich App at 570. The trial court considered plaintiff's testimony about the children's development, needs, routines, EJC's increasing independence, establishing bedtime routines, discipline, and working with MJC on developmental milestones, and its description of defendant's understanding of the children's needs, routines, and care as "more superficial" was apt.

Under MCL 722.23(f), courts consider "[t]he moral fitness of the parties involved." "[Q]uestionable conduct is relevant to factor f only if it is a type of conduct that necessarily has a significant influence on how one will function *as a parent*." *Fletcher*, 447 Mich at 887. The trial court found this factor favored plaintiff, stating that "[v]iewed together, [defendant's] extramarital affair during [plaintiff's] pregnancy with [MJC], his deception during marriage counseling, and his use of unprescribed Adderall raise significant moral fitness concerns that directly impact his capacity to function as a parent." Regarding the influence on defendant's parenting skills, the trial court noted that "[t]his demonstrates a willingness to deceive those who depend on him for honesty . . . . Children require parents who are honest and trustworthy; [defendant's] deception during a critical period when his family needed transparency raises serious concerns about his reliability as a parent."

Defendant argues that the trial court erroneously placed significant emphasis on his affair in determining this factor, citing *Fletcher*, 447 Mich at 888. *Fletcher* held that "to punish [a parent's] infidelity at the risk of jeopardizing a child's best interests simply contravenes the overriding purpose of the Child Custody Act" and that because of the "limited probative value" of affairs "and the significant potential for prejudicially ascribing disproportionate weight to that fact, extramarital conduct, in and of itself, may not be relevant to factor f." *Id*. at 887.

But the trial court's determination under MCL 722.23(f) was not based on defendant's extramarital affair, but rather his questionable conduct that influenced how defendant would function as a parent. The trial court did not consider defendant's extramarital affair "in and of itself" in its evaluation, nor did it consider his marital misconduct as having an adverse effect on his ability to raise the children. *Id*. Instead, the trial court considered defendant's deceptive behavior generally (namely, entering into an affair while actively participating in marriage counseling) as having an adverse effect on his parenting abilities and being "particularly troubling," *not* the extramarital affair itself. *Berger*, 277 Mich App at 714 (holding that "*Fletcher* teaches that evidence of an affair is not relevant to factor f unless it is relevant to the relative fitness of a party to provide for [a] child").

Finally, under MCL 722.23(j), courts consider "[t]he willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents." Defendant argues that this factor should have favored him, but the trial court *did* find that this factor "slightly favors" defendant, explaining that "both parties have work to do in facilitating the other parent's relationship with the children." Even if the trial court had found that this factor *fully* favored him, defendant has not demonstrated how the trial court's custody determination would have been different. The trial court's custody determination is not made "on the basis of a mathematical calculation" and "differing weights" may be assigned to the various best-interest factors. *Riemer*, 311 Mich App at 645.

Accordingly, the trial court's finding that defendant failed to show, by clear and convincing evidence, that a change in the children's established custodial environment was in the children's

best interests, was not against the great weight of the evidence. *Pennington*, 329 Mich App 562, 570; *Pierron*, 486 Mich at 85.

Affirmed.

/s/ James Robert Redford
/s/ Randy J. Wallace
/s/ Andrew J. Lievense