*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MICHAEL J. BLAKE,

      Plaintiff/Counterdefendant-Appellant,

v

ANGELA L. ARGYRIOU,

      Defendant/Counterplaintiff-Appellee.

UNPUBLISHED
September 04, 2025
12:26 PM

No. 370218
Macomb Circuit Court
Family Division
LC No. 2020-001278-DC

Before: PATEL, P.J., and RIORDAN and SWARTZLE, JJ.

PER CURIAM.

Plaintiff/counterdefendant challenges the trial court's determinations regarding custody, child support, and attorney fees. We affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

SLB was born to plaintiff and defendant in March 2020, at which time the parties lived together. Plaintiff and defendant separated in June 2020, and defendant left the home with SLB.

Plaintiff filed a verified complaint for custody and support. At the outset of the proceedings, the Macomb County Friend of the Court (FOC) recommended that defendant have interim physical custody of SLB and that the parties share joint legal custody. The trial court entered an interim order to this effect in July 2020. Plaintiff objected to the FOC's recommendation, and the trial court held a hearing on the issue. In September 2020, the trial court entered an order granting plaintiff parenting time from Monday mornings through Tuesday evenings and every other weekend from Friday evening through Sunday evening.

Child support for SLB, as well as plaintiff's income, became contentious subjects early in the proceedings. In November 2020, defendant moved the trial court to order child support, asserting that plaintiff was employed in a skilled trade at the General Motors (GM) Technical Center, but he had not provided her with any earnings or income information, and he had not provided any child support since defendant moved out. Defendant was self-employed and earned

$200 to $300 a week as a hair and makeup artist. In response, plaintiff asserted that he had been laid off from his job at GM since March 2020 when the pandemic started. Plaintiff claimed to have provided supplies for SLB during his parenting time, and he was willing to care for SLB when defendant was working so that defendant did not have to pay for childcare.

The referee held a hearing on defendant's motion, by which time defendant was living in her own apartment and plaintiff had returned to work. Defense counsel informed the referee that plaintiff had refused to turn over his income information. When the referee asked plaintiff about why he had not submitted the information, plaintiff responded that he did not receive the letter from the FOC, and, "I just don't have the information available that [the FOC investigator] requested." Plaintiff's counsel stated that plaintiff would provide the information. Plaintiff indicated that he also owned a business, Auto Focus, LLC, but he stated that it had been shut down as a result of restrictions arising from the COVID-19 pandemic. The referee ordered both parties to submit their tax returns and referred the matter to a support investigator for a final support recommendation. The support investigator filed a recommendation in February 2021, noting that plaintiff had "failed to provide his income information."

During a hearing held in April 2021, one of the issues before the trial court was defendant's motion for an order to show cause against plaintiff for not complying with discovery. Defense counsel informed the trial court that plaintiff was not being cooperative with providing proof of his income. The trial court ordered plaintiff to produce the information.

The trial court held a three-day bench trial in June 2022. Plaintiff requested that the trial court award the parties joint legal and physical custody, with the parties sharing equal parenting time. Defendant requested that she be granted sole legal custody.

Plaintiff's first witness was SLB's pediatrician, Dr. Susan Dombrowski. Dr. Dombrowski, when asked if she recalled whether the parties had disagreements about how to treat and care for SLB, responded that "it seemed like there was always some tension during the visits." Dr. Dombrowski was aware of various disagreements that the parents had, including about how to feed SLB and whether she needed a speech evaluation. Dr. Dombrowski described plaintiff as a concerned father who attended SLB's doctor visits and would ask questions regarding her well-being. Dr. Dombrowski did not think that either party was making wrong decisions with respect to raising SLB, and she believed that each parent cared about SLB and wanted the best for her. A registered nurse also testified about the parties contacting the pediatrician's office about their disagreement on how to feed SLB.

Donna Weinstein, Ph.D., a licensed professional counselor, testified that she began treating plaintiff in January 2022. When talking about SLB, plaintiff's face lit up, he smiled, and he would share what he had done with SLB during visits with her. Plaintiff was "visibly upset" and tearful when talking about not seeing SLB. Plaintiff had not exhibited any behavior during their sessions that led Dr. Weinstein to believe that plaintiff had any anger issues, and Dr. Weinstein did not have concerns about plaintiff's ability to parent SLB.

During his direct examination, plaintiff testified about his GM income. Plaintiff also explained that he was the sole owner of Auto Focus, which was a secondhand auto dealer. Plaintiff's expenses for Auto Focus included rent, utilities, insurance, repairs on the vehicles,

-2-

outdoor maintenance, auction fees, towing fees, and gas. Plaintiff generally stored approximately 15 vehicles at Auto Focus, each valued at approximately $1,000 to $2,000, for which plaintiff usually paid $500 to $750 a vehicle. In 2019, Auto Focus purchased 23 vehicles and sold 18 vehicles. Plaintiff could not say how much money he earned in 2019, but he estimated that it was not a profitable year given the overhead charges and expenses. In 2020, with the pandemic impacting his business, plaintiff purchased six cars and sold eight. Plaintiff did not know how much money he earned from Auto Focus that year. In 2021, plaintiff sold one car and did not purchase any, and he had not been as involved with the business since SLB was born because he wanted to spend time with her. Plaintiff had not purchased or sold any vehicles in 2022 and considered Auto Focus to be "dormant." Plaintiff's mother helped him manage the books for Auto Focus, but she was not an official bookkeeper and did not maintain business records. At the time of trial, plaintiff had not filed income taxes since approximately 2012 or 2014. Plaintiff also did not believe that defendant had disclosed all of her income to the FOC. Defendant had told plaintiff when they were living together that a great deal of her income was generated in cash. Plaintiff's parents had assisted him by paying some of his legal costs and other bills.

Plaintiff testified that his relationship with SLB was his "number one priority," and they had "a great bond." Plaintiff read with SLB, took her to the library and parks, and they spent time with plaintiff's family. Plaintiff provided guidance and direction to SLB, and he wanted to raise her in his Catholic religion. The parties had shared the responsibilities of caring for SLB after she was born. When plaintiff was laid off in March 2020 because of the pandemic, and defendant returned to work in April 2020, plaintiff cared for SLB while defendant was at work. In June 2020, the couple had an argument, and plaintiff twice left the house to deescalate the situation. When he returned the second time, defendant and SLB were gone. When the parties spoke days later, plaintiff asked about SLB, and defendant told him that she would not allow him to see SLB until he had a court order. Plaintiff saw SLB at one doctor's appointment, but defendant would not allow plaintiff to touch SLB. Ultimately, plaintiff had to wait approximately eight weeks before he was able to visit with SLB.

Further, plaintiff testified that defendant had hit or pushed him during "multiple incidents," including an incident in which defendant was holding SLB. In an incident over Memorial Day weekend in 2020, defendant had taken SLB to the beach, and SLB got a sunburn on her face. When plaintiff asked defendant about it, defendant began "vandalizing the house." Plaintiff was concerned because SLB was sitting in her baby chair on the counter, near where defendant cleared the counter with her arm, knocking all of the items onto the floor and shattering a dish. Plaintiff called the police because of defendant's behavior, but when the police arrived, the officers focused more on SLB's sunburn than on plaintiff's allegations of domestic violence. In November 2019, the couple had an altercation, and plaintiff went to his shop to stay the night. Defendant went to the shop and repeatedly called and texted him, calling him a coward. After defendant left, plaintiff saw that defendant had "keyed" the entire left side of his car. Plaintiff filed a police report, and defendant was charged with malicious destruction of property. Defendant ultimately pleaded guilty to a lesser charge and received one year of probation.

Plaintiff had participated in both self-initiated and court-ordered parenting programs, and he had found them to be helpful. Plaintiff also testified about giving defendant extra parenting time, including on SLB's first birthday when he returned SLB to defendant early so that SLB could spend time with both parents. On SLB's second birthday, however, plaintiff's parenting time was

scheduled to begin at 10:00 a.m., but defendant refused to bring SLB to the parenting-time exchange until 3:00 p.m., and plaintiff ended up not exercising parenting time that day. On at least two other occasions, plaintiff arrived for an exchange and defendant did not appear. The trial court asked plaintiff to give examples of what he had done to promote a relationship between defendant and SLB, and plaintiff spoke about sharing SLB's first birthday and holidays with defendant. At parenting-time exchanges, plaintiff tried to get SLB excited to see defendant so that it would be a pleasant transition. Plaintiff also purchased gifts for SLB to give to defendant. Plaintiff thought that he could cooperate with defendant, and, although he had initially not wanted to continue coparenting counseling, he had later reached out to the coparenting counselor. Plaintiff had wanted to enroll SLB in swim lessons, but defendant was resistant to doing so. Defendant later enrolled SLB into swim lessons without telling plaintiff, and she cancelled an appointment that plaintiff had planned to attend.

The trial court expressed concern that while plaintiff talked about trying to foster a strong coparenting relationship, it was like "pulling teeth trying to get income information." The trial court stated that defendant was potentially upset about some of plaintiff's ongoing behaviors, including plaintiff taking SLB for a speech evaluation against defendant's wishes.

Plaintiff stated that there were several inaccuracies in Dr. Carmine Palmieri's psychological evaluation of plaintiff, including dates of certain events. Plaintiff also asserted that Dr. Palmieri thought that plaintiff had a medical condition that plaintiff did not have. The trial court stated that plaintiff could indicate if facts in the report were inaccurate, but plaintiff did not "get to argue with a psychologist." The trial court further instructed plaintiff's counsel that she could pursue the matter on cross-examination of Dr. Palmieri.

For her part, defendant testified that she and SLB had a "great" emotional bond, and they were very affectionate with each other. SLB and defendant had bedtime and morning routines, they went to the park and playdates, and they had memberships to the zoo and museum. If SLB misbehaved, then defendant disciplined her by giving her a timeout. When asked if defendant had discussed with plaintiff SLB's schedule once she began school, defendant stated that they had "never been able to communicate about anything."

Defendant believed that plaintiff could provide SLB with guidance and education, and she acknowledged that plaintiff and SLB shared love and affection. Defendant also testified that plaintiff could provide food, clothing, and medical care for SLB, but defendant did not believe that plaintiff's home was safe or stable. For example, defendant described plaintiff's home as a "hoarder house." Defendant thought that plaintiff was morally fit to care for SLB, but she did not believe that plaintiff was willing to foster a close relationship between herself and SLB. Defendant claimed to be very remorseful for keying plaintiff's car. According to defendant, plaintiff had ruined her reputation by constantly sending subpoenas to everyone with whom she had done business. Further, SLB had been "kicked out" of the swim program because plaintiff would not stop calling the facility. Defendant wanted to be able to coparent, but she felt that everything was a "war" with plaintiff. Defendant denied speaking negatively about plaintiff to SLB. Defendant described plaintiff as being vindictive, angry, and unable to "let things go." Toward the end of the relationship, defendant "punched [plaintiff] in the arm because he pushed [her]," but she denied that there was other violence. Defendant was willing to engage in virtual coparenting counseling with plaintiff, but she did not want to be in the same room as him. Defendant did not believe that

she and plaintiff could make decisions together if given joint legal custody. Defendant estimated that plaintiff had called the police approximately three to five times related to issues like feeding SLB and the sunburn. Defendant believed, however, that she could promote a good relationship between plaintiff and SLB.

Plaintiff's counsel questioned defendant about her income. Defendant conceded that she had not reported all of her income in her 2020 income tax return. When plaintiff's counsel questioned defendant about some of her income as an independent contractor, defendant was not certain about where she would find the information. Defense counsel objected when plaintiff's counsel continued the questioning, and, after some dialogue with the trial court, defendant confirmed that she had hired someone to prepare her taxes. The trial court stated that plaintiff's counsel was "focusing on nickel [and] diming" defendant, who had worked as a hairdresser and earned $12,400 in 2020, while defendant had not provided his income information or filed his taxes. The trial court stated that counsel could admit other documents regarding the parties' income.

Defendant also testified that her parents helped her by giving her money to pay her bills, ranging from $200 to $600 a week. Defendant received food assistance and had been approved for daycare assistance. Further, defendant and SLB received Medicaid insurance, while SLB was also on plaintiff's health insurance. Defendant denied that she could pay her own attorney fees.

Dr. Palmieri, a psychologist, testified that he had performed a psychological evaluation of plaintiff. Dr. Palmieri described plaintiff as "remarkably reticent to answer" questions. Plaintiff was "not mentally ill," but he had "anger issues" and was "obsessive," "oppositional," and "defiant." Dr. Palmieri did not believe that plaintiff could take advice, and he did not have the ability to maintain close relationships. Further, Dr. Palmieri did not believe that plaintiff was capable of coparenting or communicating with others in a way that was effective to raise SLB. Defense counsel objected to some of plaintiff's counsel's questioning on cross-examination, on the basis that it went beyond the scope of direct examination. The trial court sustained some of these objections and overruled one.

In a September 2022 opinion and order, the trial court first determined that SLB's established custodial environment was with defendant. After considering the best-interest factors of MCL 722.23, the trial court awarded sole legal and physical custody of SLB to defendant. Relevant to this appeal, the trial court weighed MCL 722.23(d) in defendant's favor, emphasizing that SLB had lived with defendant since defendant and SLB left plaintiff's home when SLB was three months old, and "[c]ontinuity of this environment is desirable." The trial court declined to consider MCL 722.23(e) on the basis that the permanence of the family unit was irrelevant when the parties had only lived together for approximately three months after SLB was born. Next, the trial court "highly" weighed MCL 722.23(f) in defendant's favor because, although plaintiff loved and cared for SLB, plaintiff was "lacking somewhat" in moral fitness. The trial court found that plaintiff's "defiance and refusal to comply with simple orders to establish income for purposes of child support [was] certainly evidence of his credibility and morality." Plaintiff had also, according to the trial court, provided untruthful testimony about his income "more times than [the trial court could] count." The trial court weighed MCL 722.23(g) in defendant's favor, noting that defendant was in good mental and physical health and was able to care for SLB, while Dr. Weinstein and Dr. Palmieri gave differing opinions regarding plaintiff. As to MCL 722.23(j), the

trial court found that plaintiff could not coparent with defendant because he "use[d] every opportunity to agitate" her. The trial court noted that, in spite of a court order stating that plaintiff was not to take SLB to a speech evaluation, plaintiff did so anyway. The trial court also found that plaintiff's testimony that he was able to promote a strong relationship between defendant and SLB was "unconvincing," despite his testimony about sharing holidays and gifts with defendant. In contradistinction, defendant attempted to include plaintiff, and the trial court weighed this factor in defendant's favor.

The trial court did weigh MCL 722.23(k) slightly in favor of plaintiff, acknowledging plaintiff's accusations of defendant hitting him as well as the incident in which defendant damaged plaintiff's car. The trial court weighed equally Factors (a), (b), and (c), and the trial court determined that Factors (h) and (i) were not relevant because of SLB's young age. The trial court awarded plaintiff parenting time to include every other weekend and every Wednesday evening.

Next, the trial court acknowledged that it was required to follow the Michigan Child Support Formula (MCSF), and the first step in determining child support was to determine each party's net income. As to plaintiff's income, the trial court observed that, throughout the proceedings, plaintiff had been both combative and resistant to disclosing his income. The trial court concluded that plaintiff was voluntarily reducing his income. Accordingly, the trial court rereferred the matter to the FOC to determine child support. Regarding attorney fees, the trial court found that defendant had established that she was unable to bear the expense of litigation, while plaintiff could, and that plaintiff "lied under oath repeatedly." Accordingly, the trial court ordered an evidentiary hearing with the FOC to determine the amount of attorney fees.

A four-day evidentiary hearing followed. During his testimony, plaintiff objected to entries in the legal invoices of defendant's attorney on the basis that the billings were duplicates or inaccurate. When questioning defendant, defense counsel admitted a revised billing statement from July 2022, totaling $44,026.70, which excluded the charges to which plaintiff had objected. Defense counsel also admitted an invoice from April 2023 that he explained reflected $8,325 in fees for "post-trial support issues."

In the referee's report and recommendation, the referee noted that "[p]laintiff failed to provide his personal and business income tax returns as Ordered by the Court, [which] significantly affected the Referee's ability to determine child support and attorney's fees." The referee also noted that each party had engaged in "scorched earth tactics," neither party was fully transparent about their income, and "[t]he behavior of both the Plaintiff and the Defendant increased the length of the litigation and increased the costs, specifically attorney's fees." The referee found that defendant was "not credible and came extremely close to lying." On the basis of defendant's testimony, the referee surmised that defendant would continue to earn income through self-employment despite testifying that she intended to work for Beaumont Hospital. The referee recommended using $87,565 gross annual income for plaintiff's job with GM, and imputing $50,000 for plaintiff's gross income from Auto Focus, deducting estimated expenses, for a net self-employment income of $25,000.

According to the referee, an evidentiary hearing regarding child support should only have taken three hours, and the hearing would not have taken multiple days "if not for the Plaintiff's evasiveness and refusal to provide tax returns." The referee noted, however, that plaintiff's

availability to devote time to Auto Focus was reduced by his full-time work and parenting time. Referring to plaintiff's detailed objections to defense counsel's billings during trial, the referee stated that plaintiff and his counsel could have reviewed the invoice before the hearing and submitted "a short summary," allowing the issue to be "handled in minutes," rather than hours.

As to attorney fees, the referee found that defense counsel's fee of $250 an hour was reasonable. Defense counsel had provided a bill totaling $59,000 in fees up to the time of the evidentiary hearing, but the referee noted that there were duplicate billings and the corrected total was $41,000. The referee determined that plaintiff had the ability to contribute to defendant's legal fees, defendant had a financial need, and plaintiff failed to provide ordered financial records. Accordingly, the referee recommended that plaintiff pay to defense counsel the cost of defendant's attorney fees for the evidentiary hearing, totaling $8,325. Further, the referee recommended that plaintiff pay to defense counsel $15,000 for having to establish income as part of the initial proceedings. The referee noted that the amounts "take into account that the Defendant also contributed to the intensity and animosity of the litigation."

Plaintiff filed objections to the referee's recommendations. Following a hearing, the trial court rejected plaintiff's objections and adopted the referee's recommendations. Plaintiff moved for reconsideration of the trial court's decision, which the trial court denied.

Plaintiff now appeals.

## II. ANALYSIS

This Court should affirm the judgment of a trial judge in a child-custody dispute "unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue." *Sabatine v Sabatine*, 513 Mich 276, 284; 15 NW3d 204 (2024) (cleaned up). See also MCL 722.28. "[A] reviewing court should not substitute its judgment on questions of fact unless the factual determination clearly preponderates in the opposite direction." *Pierron v Pierron*, 486 Mich 81, 85; 782 NW2d 480 (2010). A trial court abuses its discretion if its decision falls outside the range of principled outcomes. *Varran v Granneman (On Remand)*, 312 Mich App 591, 621; 880 NW2d 242 (2015).

### A. ESTABLISHED CUSTODIAL ENVIRONMENT

First, plaintiff argues that the trial court erred by determining that SLB's established custodial environment was with defendant, and, accordingly, requiring plaintiff to demonstrate by clear-and-convincing evidence that a change was in SLB's best interests. "[W]hen considering an important decision affecting the welfare of the child, the trial court must first determine whether the proposed change would modify the established custodial environment." *Pierron*, 486 Mich at 92. Whether an established custodial environment exists is a question of fact that the trial court must decide before it makes a custody determination. *Riemer v Johnson*, 311 Mich App 632, 641; 876 NW2d 279 (2015). A "court shall not modify or amend its previous judgment or orders or issue a new order so as to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child." MCL 722.27(1)(c). An established custodial environment exists "if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life,

and parental comfort." MCL 722.27(1)(c). When a court determines whether a change would disrupt the child's established custodial environment, "the dispositive inquiry is not whether an established custodial environment existed prior to separation; rather, it is whether such an environment continues to exist, or a new one exists, at the time of the trial court's custody determination." *Sabatine*, 513 Mich at 289-290.

Plaintiff contends that the trial court noted the correct law, but failed to apply it properly, and only focused on SLB having lived primarily with defendant, rather than also considering plaintiff's parenting time and relationship with SLB. The trial court's opinion and order reflected that it considered plaintiff's testimony that plaintiff and SLB shared a strong emotional bond, as well as the quality time they spent engaging in activities together. Likewise, it was apparent that the trial court considered SLB's tender age, her physical environment, and the "permanency of the relationship" between SLB and defendant when weighing the fact that SLB lived with defendant since the couple separated when SLB was three months old. Accordingly, the record demonstrates that the trial court properly considered SLB's relationship with each party.

Although plaintiff argues that the trial court failed to consider whether SLB also had an established custodial environment with plaintiff, this Court will not interfere with the trial court's finding of fact regarding the established custodial environment unless the evidence clearly preponderates in the opposite direction of the trial court's finding. See *Pennington v Pennington*, 329 Mich App 562, 578; 944 NW2d 131 (2019). Specifically, defendant testified that she was the individual that cared for SLB on a daily basis since June 2020 and that she and SLB shared a daily routine in which defendant cared for SLB's needs. Although the number of overnights alone is not dispositive of whether an established custodial environment exists, see *Sabatine*, 513 Mich at 293 n 5, the evidence did not clearly preponderate against the trial court's factual determination in this case.

Next, plaintiff argues that the trial court failed to consider whether plaintiff's proposed parenting time would have actually modified the established custodial environment. From September 2020 until the time of the bench trial in June 2022, plaintiff had parenting time with SLB approximately every Monday morning through Tuesday evening and every other weekend. If the trial court were to grant plaintiff's request to give the parties equal parenting time, then the change would alter SLB's established custodial environment because it would change to whom SLB would look on a daily basis for parental guidance, comfort, and the necessities of life. See *Marik v Marik*, 325 Mich App 353, 361; 925 NW2d 885 (2018).

Plaintiff also argues that the trial court's decision was influenced by passion and bias. The record demonstrates, however, that the trial court's decision was made on the basis of the record evidence, and its factual findings regarding the established custodial environment were not against the great weight of the evidence.

## B. LEGAL CUSTODY

Next, plaintiff challenges the trial court's decision to award defendant sole legal custody, arguing that the trial court's findings on several of the best-interest factors were against the great weight of the evidence, and that, in weighing the best-interest factors, the trial court did not correctly apply the law. Joint legal custody means "[t]hat the parents shall share decision-making

authority as to the important decisions affecting the welfare of the child." MCL 722.26a(7). See also *Lieberman v Orr*, 319 Mich App 68, 79-80; 900 NW2d 130 (2017). If either parent requests joint custody, then the trial court must consider it. See MCL 722.26a(1).

In all custody disputes, "the best interests of the child control" a trial court's decisions. MCL 722.25(1). The trial court must, therefore, resolve custody disputes by determining what is in the child's best interest, as measured by the factors in MCL 722.23. See *Eldred v Ziny*, 246 Mich App 142, 150; 631 NW2d 748 (2001). When resolving a custody dispute, the trial court must consider each factor and state its findings regarding the factor. See *Rittershaus v Rittershaus*, 273 Mich App 462, 475; 730 NW2d 262 (2007). The trial court need not, however, give equal weight to all factors. See *Sinicropi v Mazurek*, 273 Mich App 149, 184; 729 NW2d 256 (2006). Joint custody is not an option when parents "would not be able to cooperate and generally agree concerning important decisions affecting the welfare of the child." *Wright v Wright*, 279 Mich App 291, 299-300; 761 NW2d 443 (2008).

First, plaintiff argues on appeal that, when modifying legal custody, the trial court failed to apply the standards set forth in *Vodvarka v Grasmeyer*, 259 Mich App 499; 675 NW2d 847 (2003). In *Vodvarka*, 259 Mich App at 508, this Court acknowledged that, before a trial court may grant a party's request to change custody, the party must first demonstrate the existence of a "proper cause or a change of circumstances." See also MCL 722.27(1)(c). In this case, however, the trial court's previous temporary custody order had not been entered following an evidentiary hearing that resulted in a best-interest determination, and, accordingly, the trial court was not required to determine whether a proper cause or change of circumstance existed before changing custody. See, e.g., *Thompson v Thompson*, 261 Mich App 353, 358-359; 683 NW2d 250 (2004).

Turning to the best-interest factors, the trial court's conclusion that Factor (d) favored defendant was not against the great weight of the evidence. Under MCL 722.23(d), the trial court considers "[t]he length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity." Although plaintiff claims that the trial court failed to consider plaintiff's living situation, the trial court's opinion demonstrates that it was aware of, and considered, plaintiff's living environment. The trial court also considered, however, that SLB had stayed with defendant since they left plaintiff's home and the continuity of that environment was appropriate.

Plaintiff next claims that the trial court erred by declining to address MCL 722.23(e), which addresses "[t]he permanence, as a family unit, of the existing or proposed custodial home or homes." As plaintiff argues, the trial court's inquiry should have focused on the permanency of each existing or proposed custodial home, rather than the arrangement when the couple still lived together. Accordingly, the trial court erred by declining to consider this factor.

Turning to Factor (f), which addresses "[t]he moral fitness of the parties involved," MCL 722.23(f), plaintiff argues that the trial court erred by weighing this factor "highly" in favor of defendant. Plaintiff claims that the trial court equated his not filing tax returns with not paying taxes, when he actually paid some personal income taxes because these were withheld from his GM paycheck. Plaintiff also denies being evasive during the lower court proceedings and, instead, attributes his inability to provide the trial court with documentation regarding income garnered from Auto Focus to the fact that he did not have the documentation and did not keep such financial

records. Further, plaintiff asserts that the trial court should have only considered any alleged deficiency in his moral fitness to the extent that it was relevant to his ability to parent SLB.

In *Fletcher v Fletcher*, 447 Mich 871, 887; 526 NW2d 889 (1994), our Michigan Supreme Court explained that "questionable conduct is relevant to factor f only if it is a type of conduct that necessarily has a significant influence on how one will function *as a parent*." When making this determination, "courts must look to the parent-child relationship and the effect that the conduct at issue will have on that relationship," rather than determining who is "the morally superior adult." *Id*. (cleaned up).

Here, it is a close question whether plaintiff's evasive testimony has relevance to his fitness as a parent. Types of conduct that may be relevant to a person's moral fitness as a parent include, for example, "verbal abuse, drinking problems, driving record, physical or sexual abuse of children, and other illegal or offensive behaviors." *Id*. at 887 n 6. Plaintiff has not, however, demonstrated that the evidence *clearly* preponderates in the opposite direction. See *Pierron*, 486 Mich at 85. We defer to the trial court's assessment of the credibility of the witnesses who testify before it, *Safdar v Aziz*, 342 Mich App 165, 177; 992 NW2d 913 (2022), and the trial court was rightfully concerned that plaintiff was not being forthright with the court about his income. Even assuming arguendo, however, that the trial court erred by weighing this factor heavily in defendant's favor, as further explained below, defendant has not demonstrated that the trial court's overall best-interest determination was erroneous.

Regarding Factor (g), which addresses the mental and physical health of each party, MCL 722.23(g), plaintiff asserts that the trial court did not address the fact that defendant struggled with anger. Contrary to plaintiff's argument, however, the trial court observed in its September 2022 opinion that defendant had keyed plaintiff's car and completed an anger-management course, and the trial court acknowledged plaintiff's allegations of violence by defendant. The trial court also considered the opinions of Dr. Weinstein and Dr. Palmieri, including Dr. Weinstein's positive testimony about plaintiff's ability to parent.

Plaintiff specifically challenges the trial court's decision to limit his counsel's questioning of plaintiff about Dr. Palmieri's report and argues that the trial court violated plaintiff's due-process rights by limiting plaintiff's counsel in her cross-examination of Dr. Palmieri. We review for an abuse of discretion a party's preserved evidentiary challenges. *Kuebler v Kuebler*, 346 Mich App 633, 653; 13 NW3d 339 (2023). At the time of trial,[1] MRE 103(a)(2) provided that error could not be predicated on a ruling of the trial court excluding evidence unless a substantial right of the party was affected and, in a situation in which evidence was excluded, the substance of the evidence was made known to the court by offer of proof or "was apparent from the context within which questions were asked." The record reflects that plaintiff complied with MRE 103(a)(2) with respect to the questioning of plaintiff. In contrast, plaintiff's counsel did not pursue a line of questioning with Dr. Palmieri about the same factual inaccuracies. Thus, this aspect of plaintiff's claim of error is unpreserved. Additionally, plaintiff did not raise his due-process challenge in the

---

[1] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. All evidentiary rules cited in this opinion refer to the version in effect at the time of trial.

-10-

trial court, rendering this issue unpreserved. See *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, Inc*, 347 Mich App 280, 289; 14 NW3d 472 (2023).

The plain-error standard of review extends to unpreserved error in child custody cases. See *Quint v Quint*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 368002); slip op at 7. To avoid forfeiture of a plain error, a party must demonstrate that an error occurred, the error was clear or obvious, and the error affected substantial rights. *In re Pederson*, 331 Mich App 445, 463; 951 NW2d 704 (2020). Reversal is warranted if the error "seriously affected the fairness, integrity or public reputation of judicial proceedings." *Id.* (cleaned up).

At the time of trial, MRE 611(a) provided that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Further, a witness may be cross-examined about matters relevant to the case, but a "judge may limit cross-examination with respect to matters not testified to on direct examination." MRE 611(c).

In a civil case, due process "generally requires notice of the nature of the proceedings, an opportunity to be heard in a meaningful time and manner, and an impartial decision-maker." *Cummings v Wayne Co*, 210 Mich App 249, 253; 533 NW2d 13 (1995). Although the opportunity to be heard does not necessarily require a full trial-like proceeding, it requires a hearing that allows "a party the chance to know and respond to the evidence." *Id.* A party that is confronted with evidence that is damaging to his case is placed in a difficult strategic position if not provided with the opportunity to respond by presenting evidence to contradict or undermine the damaging evidence. *Blackman v Millward*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367240); slip op at 13, lv pending.

The record reflects that the trial court exercised its authority to place reasonable limits on counsel's questioning of plaintiff to ensure that the questioning was effective to determine the truth and to avoid the unnecessary consumption of judicial resources and time. See MRE 611(a). Although plaintiff argues on appeal that preventing him from testifying about the facts underlying Dr. Palmieri's opinion prevented the proper evaluation of that opinion, plaintiff does not demonstrate how further allowing him to testify about certain factual inaccuracies, which seemed to relate primarily to dates of certain events and a medical diagnosis with which plaintiff disagreed, impacted Dr. Palmieri's evaluation of his behavior.

Further, when plaintiff's counsel cross-examined Dr. Palmieri, plaintiff's counsel did not pursue the same line of questioning regarding factual inaccuracies, but, instead, asked Dr. Palmieri questions about other subjects in an effort to discredit the report's conclusions. There is no indication in the record that plaintiff's counsel was precluded from meaningfully cross-examining Dr. Palmieri. Instead, the record reflects that the trial court only curtailed counsel's cross-examination of Dr. Palmier when it went beyond the scope of direct examination or to ensure that the cross-examination served as an effective vehicle for the truth-seeking function. See MRE 611. Plaintiff has also not demonstrated plain error with respect to his contention that he was deprived of due process regarding his ability to cross-examine Dr. Palmieri.

Dr. Palmieri testified that plaintiff was oppositional, defiant, and would not be a good candidate for coparenting. The trial court was also presented with evidence during the trial that defendant struggled with her anger and keyed plaintiff's car while pregnant, which led to criminal charges and probation. Further, the trial court heard from Dr. Weinstein that plaintiff did not struggle with anger. Accordingly, plaintiff was well able to present evidence that undermined the damaging evidence against him, his due-process rights were not violated, and the trial court properly considered Factor (g).

Finally, plaintiff challenges the trial court's consideration of Factor (j), which addresses each party's "willingness and ability" to encourage a relationship between the child and the other parent. MCL 722.23(j). See also *Martin v Martin*, 331 Mich App 224, 239; 952 NW2d 530 (2020). Although plaintiff asserts on appeal that the trial court did not consider important factors relevant to him encouraging a close relationship between defendant and SLB, the trial court acknowledged some of the efforts that plaintiff had made to encourage a relationship between defendant and SLB, including that plaintiff had allowed defendant to exercise extra parenting time. The trial court found, however, that plaintiff's testimony about promoting a relationship between SLB and defendant was "unconvincing" and that defendant had not "purposefully denied parenting time." A trial court need not comment on every piece of evidence or argument when rendering its custody determination, but "the record must be sufficient for this Court to determine whether the evidence clearly preponderates against the trial court's findings." *MacIntyre v MacIntyre*, 267 Mich App 449, 452; 705 NW2d 144 (2005). Here, the trial court thoroughly reviewed the evidence, and its factual determination was not against the great weight of the evidence.

Accordingly, although the trial court erred by concluding that Factor (e) was not relevant, and, even if it erred by weighing Factor (f) heavily in defendant's favor, the trial court's ultimate dispositional ruling to award defendant sole legal custody did not amount to an abuse of discretion. The trial court weighed several of the best-interest factors in favor of defendant, and the record clearly demonstrated that the parties struggled to coparent and could not agree on many issues regarding SLB's well-being. See *Fisher v Fisher*, 118 Mich App 227, 233; 324 NW2d 582 (1982).

## C. QUESTIONING OF DEFENDANT REGARDING HER INCOME

Next, plaintiff argues that the trial court abused its discretion by limiting the ability of counsel to question defendant regarding her 2020 tax return and deprived plaintiff of his right to due process. Plaintiff did not preserve his due-process challenge in the trial court. See *Tolas Oil & Gas Exploration Co*, 347 Mich App at 289.

Plaintiff argues that his counsel should not have been precluded from cross-examining defendant on the basis of "unclean hands." Although the trial court referred to plaintiff's failure to provide financial information when curtailing additional questioning of defendant about her income, the record demonstrates that plaintiff's counsel had the opportunity to question defendant about her income, and the trial court would have permitted the parties to introduce additional evidence on the issue. "Due process requires fundamental fairness." *In re Brock*, 442 Mich 101, 111; 499 NW2d 752 (1993). Plaintiff has not demonstrated that the trial court abused its discretion by limiting counsel's questioning of defendant or deprived plaintiff of due process by doing so.

## D. IMPUTATION OF INCOME

Plaintiff next argues that the trial court abused its discretion by imputing $50,000 in business income to him for the purpose of calculating child support. We review for an abuse of discretion a trial court's decision regarding whether to impute income to a party. *Loutts v Loutts*, 298 Mich App 21, 25-26; 826 NW2d 152 (2012). We review de novo as a question of law whether the trial court properly applied the MCSF. *Clarke v Clarke*, 297 Mich App 172, 179; 823 NW2d 318 (2012).

Under the MCSF, the initial step when determining child support is to discern the net income of each party by considering all sources of income. *Carlson v Carlson*, 293 Mich App 203, 205; 809 NW2d 612 (2011). This calculation includes an individual's actual income in addition to any income imputed by the court. *Id*. A trial court may impute income if a parent voluntarily reduces income or has a voluntarily unexercised ability to earn. *Id*. at 205-206. A trial court's decision to impute income must be supported by sufficient fact-finding that the party "has an actual ability and likelihood of earning the imputed income." *Id*. at 206 (cleaned up). A trial court is limited by the parameters of the MCSF in the factors that it may consider to impute income to a party. *Stallworth v Stallworth*, 275 Mich App 282, 286; 738 NW2d 264 (2007).

In this case, the trial court was understandably concerned about plaintiff's behavior in refusing to provide certain financial information. The trial court stated in its September 2022 opinion that plaintiff was voluntarily reducing his income. The referee stated in its subsequent recommendation, however, that plaintiff had "reduced availability to devote to any other financial endeavor," and the trial court's opinion denying plaintiff's objection to the recommendation did not address this issue. Moreover, the trial court did not set forth factual findings that indicated that it considered and evaluated the enumerated factors of 2021 MCSF 2.01(G)(2). 2021 MCSF 2.01(G)(4)(b) provided that a trial court could not impute income by "assuming that an individual has an unexercised ability to earn an income" without "any information or indication concerning a parent's ability." Further, a trial court can not properly impute income if it failed to articulate information about how each factor in § 2.01(G)(2) applies to the parent having the actual ability and a reasonable likelihood of earning the imputed potential income. 2021 MCSF 2.01(G)(4)(c).

The requirement that a trial court evaluate the factors listed in the MCSF and as enumerated in caselaw ensures that the decision to impute income to a party is made on the basis of the person's actual ability and likelihood of earning the imputed income. *Ghidotti v Barber*, 459 Mich 189, 198-199; 586 NW2d 883 (1998). Although the figure of $50,000 for imputed income for Auto Focus was derived from plaintiff's trial testimony that Auto Focus garnered $43,707.54 in gross sales in 2019, the trial court imputed this income without first considering all of the factors in the MCSF or Michigan caselaw. Accordingly, on remand, the trial court must consider the factors outlined in the MCSF to determine the actual ability and likelihood of plaintiff earning the imputed income.

## E. ATTORNEY FEES

Finally, plaintiff challenges the trial court's decision to award defendant attorney fees. We review for an abuse of discretion a trial court's award of attorney fees. *Pirgu v United Servs Auto Ass'n*, 499 Mich 269, 274; 884 NW2d 257 (2016).

-13-

Attorney fees are not recoverable as part of costs or damages unless specifically allowed by statute, court rule, a common-law exception, or contract. *Colen v Colen*, 331 Mich App 295, 300; 952 NW2d 558 (2020). MCR 3.206(D)(2) provides:

A party who requests attorney fees and expenses must allege facts sufficient to show that:

(a) the party is unable to bear the expense of the action, including the expense of engaging in discovery, appropriate for the matter, and that the other party is able to pay, or

(b) the attorney fees and expenses were incurred because the other party refused to comply with a previous court order, despite having the ability to comply, or engaged in discovery practices in violation of these rules.

A trial court abuses its discretion by awarding attorney fees on the basis of unreasonable conduct without first finding that a party's misconduct caused the other party to incur the fees. See *Reed v Reed*, 265 Mich App 131, 165; 693 NW2d 825 (2005).

In this case, the trial court rereferred the matter of child support to the FOC following the bench trial, ordering that plaintiff was to pay defendant's attorney fees involving the FOC investigation. Further, the FOC was to hold an evidentiary hearing to determine the amount of attorney fees for which plaintiff was responsible, which would include the cost of the evidentiary hearing. In its September 2022 opinion, the trial court made a specific factual finding that plaintiff's "blatant defiance and refusal to participate in this case in an appropriate way" caused the need for the evidentiary hearing. The trial court also found that defendant demonstrated that she was "unable to bear the expense of this action and that Plaintiff is able to pay." After the evidentiary hearing, the referee recommended that plaintiff pay to defense counsel $8,325 for the cost of the post-judgment evidentiary hearing. Further, plaintiff was to pay to defense counsel $15,000 for the cost of having to prove income as part of the original proceedings. The referee, however, only cited to MCR 3.206(D)(2)(a), related to a party's inability to bear the expense of litigation. The referee determined that plaintiff had the ability to contribute to defendant's attorney fees and that plaintiff's failure to comply with court orders contributed to the litigation costs, including the prolonged nature of the evidentiary hearing. Further, the referee noted that it was taking into account, for both awards, that defendant contributed to the intensity of the litigation.

Accordingly, it appears from this record that the referee relied on and considered both bases for attorney fees under MCR 3.206(D)(2). It is not clear, however, as to the $15,000 award, whether the trial court ultimately awarded the attorney fees due to financial need or due to plaintiff's actions in the case. Moreover, this Court has not been provided with the invoice detailing the $8,325 award and, if the referee considered defendant's actions when deciding the award, it is unclear what amount of defense counsel's post-judgment fees the trial court was attributing to plaintiff. For an award under MCR 3.206(D)(2)(b), defendant was required to submit evidence demonstrating what fees were actually incurred because of plaintiff's misconduct. *Reed*, 265 Mich App at 165. Although the trial court was clear that plaintiff had engaged in misconduct that caused defendant to incur attorney fees, both the referee and the trial court also appeared to base some attorney fees on defendant's financial need and plaintiff's ability to pay.

Accordingly, on remand, the trial court must clarify whether the $15,000 attorney-fee award is on the basis of MCR 3.206(D)(2)(a) or (b). If (a), then the trial court must specify that the award is made on the basis of defendant's inability to bear the expense of the action and plaintiff's ability to pay. MCR 3.206(D)(2)(a). If (b), then the trial court must specify how defendant demonstrated that the particular attorney fees and expenses were incurred due to plaintiff's refusal to comply with a previous court order. Specifically, plaintiff argues that he was unable to comply with the trial court's previous order that he provide the financial records because they do not exist. The trial court was understandably frustrated throughout these prolonged proceedings with plaintiff's resistance to providing the requested financial information. To award the fees under MCR 3.206(D)(2)(b), however, the trial court must determine that plaintiff was, in fact, able to comply with its previous orders to provide the financial information. Likewise, the trial court must specify the record evidence for the $8,325 award, particularly due to the referee's consideration of defendant's actions contributing to the prolonged litigation.

## III. CONCLUSION

We affirm in part, vacate in part, and remand for further proceedings consistent with this opinion. Specifically, we vacate the child-support award with respect to the imputation of income to plaintiff, we vacate the awards of attorney fees, and we remand those matters to the trial court. We affirm in all other respects. We do not retain jurisdiction.

/s/ Sima G. Patel
/s/ Michael J. Riordan
/s/ Brock A. Swartzle

-15-