# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* YURKUS/JONES, Minors.

UNPUBLISHED
August 16, 2018

No. 341893
Macomb Circuit Court
Family Division
LC Nos. 2017-000240-NA;
          2017-000241-NA

Before: SWARTZLE, P.J., and CAVANAGH and M. J. KELLY, JJ.

PER CURIAM.

Respondent appeals by right the trial court's order terminating her parental rights to her minor children, EY and KJ, under MCL 712A.19b(3)(b)(*ii*) (failure to prevent physical injury or abuse) and (j) (reasonable likelihood that child will be harmed if returned to parent). We affirm.

## I. BACKGROUND

On May 3, 2017, respondent's boyfriend, J. Jones, dropped respondent off at work. Jones then returned home with respondent's three children, EY, IY, and KJ. Jones was KJ's legal father, but he was not EY's or IY's legal father.[1] According to Jones, when he and the children returned home, IY, who was four years old at the time, began complaining of stomach pain. He told her to sit on the couch. Jones later observed IY "biting her hand." When he asked her what was wrong, she did not respond, but "arched her back, started groaning and ultimately became unresponsive." Jones then took the three children to respondent's workplace, where someone called emergency medical services. Respondent stated that when IY arrived at respondent's work, she "had drool coming out of her mouth, was white in color and her lips were blue."

By the time IY arrived at the hospital, she was "critically ill with marginal vital signs, altered mental status and evidence of serious injury." IY was "very pale," and her treating doctor, Dr. Marc L. Cullen, testified that IY was "cold to [the] touch" and had a "very high" heart rate. IY's abdomen was "very, very distended" and she had "visible bruises" on her back and cheek. Dr. Cullen took IY into surgery, and, when he opened her abdomen, he found a

---

[1] Jones's parental rights to KJ and to his other daughter, VB, were also terminated in these proceedings, but are not at issue in this appeal.

-1-

"combination of both acute and old" injuries. He believed that IY had "lost half of her blood volume into her abdominal cavity . . . in a very short period of time." Despite extensive attempts to save the child, IY died approximately 12 hours after she arrived at the hospital.

At the termination trial, multiple doctors testified that IY's injuries were caused by high-velocity blunt-force trauma to her abdomen, likely by multiple blows. IY's pancreas was smashed, and there was "significant rupture and damage to multiple intra-abdominal organs and blood vessels leading to massive blood loss intra-abdominally." Dr. Marcus DeGraw, an expert in child-abuse pediatrics, testified that her injuries were of a type that required "really massive trauma of a repetitive basis," akin to "being hit and possibly run over by a car."

Throughout the trial, respondent tried to undermine expert testimony by suggesting that IY's injuries were caused by EY, who was almost eight years old at the time; by a bicycle accident; by falling into a tree stump; or by falling off a bed onto a wooden rocking horse. Multiple experts in pediatric medicine rejected these hypotheses.

After IY's death, EY disclosed to Children's Protective Services (CPS) professionals that Jones "whooped" IY earlier in the day. According to EY, Jones had "whooped" EY and IY on multiple occasions with his hand or with a belt. Respondent sometimes "whooped" the children as well. EY further stated that Jones sometimes sat on EY's and IY's stomachs.

According to EY, when Jones saw that IY was unresponsive on May 3, 2017, he said, "Not this again." Almost a year before IY's death, in June 2016, IY was taken to the hospital after she became unresponsive. Respondent testified that IY told her she did not remember what happened, and that EY had been hitting her throughout the day. Based on his review of the report from IY's hospital admission in June 2016, Dr. Cullen noted that IY had bruising and "evidence of a burn." Dr. Cullen believed that IY's injuries indicated "a child at risk in a chaotic environment," and he was concerned about IY's "loss of consciousness that [did not] have a very good explanation."

Following IY's death, EY was placed in the care of his father and stepmother and KJ was placed with her maternal grandmother. EY's stepmother testified that EY would frequently soil himself after visiting with respondent, and that, when she questioned EY about the accidents, he responded, "I'm just so stressed out." The record makes clear that EY was stressed out because he thought that he might go to jail for his sister's death. Equally clear from the record is that respondent blamed EY for IY's death. Indeed, EY's stepmother testified that, at IY's funeral, she overheard respondent interrogating EY as to what he did to cause IY's death.

Jones testified at trial but mostly asserted his Fifth Amendment rights in light of the murder charge pending against him following IY's death. Even after respondent heard multiple expert pediatricians testify about IY's death, she testified that she did not understand what happened and that she was not sure whether IY's death was a homicide. According to respondent's caseworker, the status of respondent's relationship with Jones changed often following IY's death. Indeed, as late as two weeks before trial, respondent was still living with Jones and, when asked at trial whether she was still in a relationship with Jones, respondent replied, "It's questionable." Respondent's continuing relationship with Jones was also evidenced by two instances of unauthorized contact respondent had with EY. Despite only having separate

supervised contact with EY and KJ, the record indicates that, on one occasion, respondent and Jones visited EY at a fair and, on another occasion, took EY out for pizza. Both incidents occurred while EY was visiting KJ when KJ was in her grandmother's care.

In a detailed opinion, the trial court concluded that statutory grounds existed to terminate respondent's parental rights under MCL 712A.19(b)(3)(b)(*ii*) and (j). The trial court found that respondent was either complicit "in the murder of her daughter or she lacks the judgment, capacity, and ability to protect her children from her paramour." The trial court further found that "[a]ll the credible evidence" suggested that respondent was protecting Jones and that respondent's "refusal to accept the fact that Jones murdered her daughter clearly makes her an unfit parent." The trial court then concluded that termination was in the best interests of both children. Again the trial court noted that respondent "does not have the capacity or ability to provide a safe or stable home for either child. Her poor decisions and lack of parenting skills result[ed] in [IY's] death." The trial court concluded that "[b]oth children need permanency and there is no evidence that [respondent] is in a position to provide it" and terminated respondent's parental rights to both children.

This appeal followed.

## II. ANALYSIS

*Statutory Grounds.* Respondent first argues that the trial court clearly erred by finding clear and convincing evidence of a statutory ground to support termination of her parental rights. The trial court terminated respondent's parental rights under MCL 712A.19b(3)(b)(*ii*) and (j). On appeal, respondent challenges the trial court's finding that MCL 712A.19b(3)(b)(*ii*) supported termination but does not challenge the trial court's finding that MCL 712A.19b(3)(j) also supported termination. Because respondent has failed to challenge the trial court's finding under MCL 712A.19b(3)(j), she has waived any error relative to that statutory ground. See *Riemer v Johnson*, 311 Mich App 632, 653; 876 NW2d 279 (2015). And, because only one ground for termination need be established to terminate a respondent's parental rights, we need not address whether MCL 712A.19b(3)(b)(*ii*) also supports termination. *In re Trejo*, 462 Mich 341, 360; 612 NW2d 407 (2000).

*Best Interests.* Respondent next argues that termination of her parental rights was not in the children's best interests. "If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). "[W]hether termination of parental rights is in the best interests of the child must be proven by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). "The trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). "To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include 'the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home.' " *Id.*, quoting *In re Olive/Metts Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012). Other relevant factors include any relevant "history of domestic violence, the parent's compliance with his or her case service plan,

the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *Id*. at 714.

We agree with the trial court that termination of respondent's parental rights was in the children's best interests and adopt the well-reasoned opinion of the trial court in this regard. The evidence presented in this case confirms that respondent would be unable to provide a safe or appropriate home for the children. The record indicates that Jones, respondent's live-in boyfriend, beat respondent's daughter to death, causing the child to suffer injuries consistent with a car crash. Despite being presented with substantial evidence that Jones caused her daughter's death, respondent failed to acknowledge Jones's culpability and, as of two weeks before the termination trial, continued to live with him. Despite the availability of services to help respondent, respondent showed that she was unable to follow petitioner's direction and engaged in unauthorized contact with the children. Notably, Jones was present for at least some of these unauthorized visits. Instead of placing blame where the evidence pointed, respondent blamed EY for IY's death, putting EY under such severe stress that he frequently soiled himself. Although the children were bonded to respondent and in safe placements with family, respondent lacks the ability to protect her children from harm. The trial court did not err by terminating respondent's parental rights to both children.

Affirmed.

/s/ Brock A. Swartzle
/s/ Mark J. Cavanagh
/s/ Michael J. Kelly