*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* J. D. FOWLER, Minor.

UNPUBLISHED
December 10, 2025
10:09 AM

No.  374559
Branch Circuit Court
Family Division
LC No.  23-006574-NA

Before:  YATES, P.J., and BOONSTRA and YOUNG, JJ.

PER CURIAM.

Respondent-mother[1] appeals by right the trial court's order terminating her parental rights to her minor child, JF.  We affirm.

## I.  FACTUAL AND PROCEDURAL HISTORY

In April 2023, petitioner, the Department of Health and Human Services (DHHS or petitioner), received a complaint from emergency service providers regarding respondent-mother and JF.  Specifically, the complainant told Children's Protective Services (CPS) that respondent-mother had taken JF to a drug house where he was exposed to people using methamphetamine, and had called 911 when JF appeared sick the following morning.  When emergency services arrived, however, JF acted normally and did not appear to be under the influence of drugs.

A CPS investigator visited respondent-mother's home to interview her about the incident. Respondent-mother admitted to taking JF to a drug house, but she denied using methamphetamine herself.  She submitted to a drug screen, which was positive for methamphetamine and amphetamine, but she refused to allow JF to be screened.  The investigator also learned that the city had "tagged" her home as uninhabitable after its water had been shut off for nonpayment.  The home's electricity was also scheduled to be shut off.  Respondent-mother told the investigator that she fell behind on bills after her husband, respondent-father, was incarcerated.  The investigator

---

[1] Respondent-father's parental rights were also terminated in the proceedings below; however, he is not a party to this appeal.

later learned that respondent-father was sentenced in February 2023 for aggravated possession of child sexually abusive material (CSAM). His earliest release date was February 2028. Respondent-mother was unemployed and had no plans to improve her financial situation aside from proving respondent-father's innocence to get him released from prison.

The DHHS petitioned the trial court to exercise jurisdiction over JF and remove JF from respondent-mother's home. The trial court authorized the petition and ordered JF removed. Following an adjudication bench trial, the trial court exercised jurisdiction over JF with respect to respondent-mother. Throughout the proceedings leading up to (and including) the adjudication trial, respondent-mother insisted that, despite his conviction for possession of CSAM, respondent-father was a "good dad" and did not pose a risk to JF.

The trial court's initial dispositional order directed respondent-mother to complete a psychological evaluation; obtain and maintain a clean, safe, and stable home environment; obtain employment; participate in substance-abuse treatment; and submit to random drug screens. When respondent-mother completed the psychological evaluation, her evaluator recommended she receive education on child sexual abuse, take parenting classes, and receive ongoing individual therapy. These recommendations were incorporated into respondent-mother's case service plan.

Respondent-mother was initially very resistant to complying with her case service plan, but eventually she completed nearly all of petitioner's recommendations. She gradually built financial independence by obtaining employment, suitable housing, and a car. She was screened for drugs on a near-weekly basis for about a year and a half, and all those tests were negative except for one positive test for alcohol and four positive tests for marijuana. She completed a parenting class and online training on recognizing and preventing child sexual abuse. She did not attend dedicated substance-abuse counseling, but she did attend weekly therapy sessions in which she discussed her history of substance abuse and worked toward the therapy goals from her psychological evaluation. She also began discussing a "safety plan" with CPS to protect JF when respondent-father returned home from prison, although she eventually divorced respondent-father.

While in foster care, JF was diagnosed with autism spectrum disorder and developmental problems with his feet. He began medical treatments to improve his walking, as well as extensive behavioral and speech therapies to improve his skills in communication and emotional regulation. He made significant progress in these areas and formed a strong bond with his foster caregiver. Respondent-mother attended nearly every medical appointment and parenting time, and she made a plan for JF to transfer to equivalent service providers in her local area if JF were returned to her care.

Despite these improvements, in April 2024, petitioner informed the trial court of its intent to file a petition for termination of respondent-mother's parental rights (which it later filed), arguing that respondent-mother had not truly benefited from the services provided to her. Petitioner noted that respondent-mother continued to deny responsibility for JF's removal from her care. Respondent-mother told CPS workers that she had not learned anything from therapy and that she was only doing it to get JF back. Petitioner believed respondent-mother had misrepresented her history of substance abuse to her therapists, and she had continued to minimize the implications of respondent-father's conviction. DHHS was also concerned that she had allowed homeless people to temporarily set up (and live in) a tent in her backyard, and had refused

to provide DHHS with information about the people living in the tent. Respondent-mother testified that she had only allowed people to store their belongings in a tent on her property while they attained housing, and that she had met the persons involved through work with a nonprofit organization. But respondent-mother later admitted to lying under oath about the tent in her backyard and admitted that the people actually were living in the tent, not just using it for storage.

A termination hearing began in August 2024 and concluded at the end of October 2024. After the hearing, the trial court "gave [respondent-mother] the benefit of the doubt" and did not terminate her parental rights.[2] In the next few months, petitioner discovered that, despite the trial court's no-contact order, respondent-mother had been facilitating communications between respondent-father and JF during her parenting time visits throughout the proceedings below, even after respondent-father's parental rights were terminated. Respondent-mother had also refused to provide petitioner with information about her new boyfriend and had recently denied a CPS worker entry to her home, claiming the worker needed a "search warrant" to enter.

In November 2024, petitioner filed a supplemental petition for termination and a motion for rehearing of the trial court's decision not to terminate respondent's parental rights. A hearing on petitioner's motion for rehearing was held in January 2025. At that hearing, a case manager for DHHS testified that JF had disclosed that he had spoken to respondent-father during a parenting time visit with respondent-mother in December 2024. The trial court terminated respondent-mother's parental rights after finding that clear and convincing evidence established statutory grounds for termination under MCL 712A.19b(3)(c)($i$), (3)(c)($ii$), and (3)(j), and that termination was in JF's best interests.

## II. STANDARD OF REVIEW

This Court reviews for clear error a trial court's determination that statutory grounds for termination exist and that termination is in the child's best interests. *In re Sanborn*, 337 Mich App 252, 272, 276; 976 NW2d 44 (2021). Clear error exists if, after reviewing the entire evidence, this Court "is left with the definite and firm conviction that a mistake has been made." *In re Olive/Metts*, 297 Mich App 35, 41; 823 NW2d 144 (2012) (quotation marks and citation omitted).

## III. STATUTORY GROUNDS

Respondent-mother argues that the trial court clearly erred when it held that statutory grounds existed to terminate her parental rights to JF. We disagree.

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *Sanborn*, 337 Mich App at 272 (quotation marks and citation omitted). If the trial court did not clearly err with respect to one statutory ground, then this Court need not address additional statutory grounds. *Id*. at 275 n 5.

---

[2] Respondent-father's parental rights to JF were terminated following this termination hearing.

In this case, the trial court terminated respondent-mother's parental rights under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), and (3)(j). However, respondent-mother's brief on appeal does not raise any argument regarding subsection (3)(j) and never cites that statutory ground, either in her statement of questions presented or in the body of her brief on appeal. Similarly, respondent-mother's brief on appeal does not actually raise an argument regarding subsection (3)(c)(*ii*), and she never cites that statutory ground. The only use of language reminiscent of subsection (3)(j) is in a subheading of respondent-mother's argument regarding subsection (3)(g) (which the trial court *did not* cite as a basis for termination of respondent-mother's parental rights). The use of language reminiscent of subsection (3)(j) in a subheading, without more, does not properly raise the subsection (3)(j) issue on appeal. See *People v Wilson*, 196 Mich App 604, 616 n 11; 493 NW2d 471 (1992) (refusing to consider an argument that a party merely suggested in a heading without a corresponding argument in the body of the brief). We could accordingly affirm the trial court on that basis alone. See *In re Hansen*, 285 Mich App 158, 164-165; 774 NW2d 698 (2009), vacated on other grounds 486 Mich 1037 (2010) ("[A]n issue is not preserved for appeal if it is not raised in the appellant's statement of questions presented."); see also *In re Toler*, 193 Mich App 474, 477; 484 NW2d 672 (1992) ("A party may not merely announce his position and leave it to us to discover and rationalize the basis for his claim."); *Riemer v Johnson*, 311 Mich App 632, 653; 876 NW2d 279 (2015).

In any event, we conclude that the trial court did not err by determining that grounds existed for terminating respondent's parental rights under subsection (3)(j). MCL 712A.19b(3)(j) provides that termination of a respondent's parental rights is warranted if "[t] here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if the child is returned to the home of the parent." MCL 712A.19b(3)(j) requires the trial court to consider the likelihood that the child would be harmed if returned to the parent's home. "Harm" includes both emotional and physical harm. *Sanborn*, 337 Mich App at 279. "[A] parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home." *In re White*, 303 Mich App 701, 711; 846 NW2d 61 (2014).

Although respondent-mother did comply with many aspects of her service plan, the trial court concluded that respondent-mother could not be trusted to avoid exposing JF to harmful people and environments. We agree. Respondent-mother was extremely resistant to the idea that respondent-father was a potential harm to JF due to his admission that he had watched and enjoyed CSAM, and seemed unable or unwilling to grasp that users of CSAM were complicit in the sexual abuse of children. Respondent-mother repeatedly allowed contact between respondent-father and JF by permitting respondent-father to call or video call during her parenting time with JF. There was evidence presented at the termination hearing that she even did so at least once after respondent-father's parental rights were terminated and after the trial court explicitly warned her that respondent-father was to have no contact with JF, either in person or via other forms of communication. Respondent-mother had also refused to disclose even the name of her new boyfriend to petitioner until directly ordered to do so by the trial court, and had denied a CPS worker entry to her home on at least one occasion.

On this record, we are not left with definite and firm conviction that the trial court made a mistake by terminating respondent-mother's parental rights under MCL 712A.19b(3)(j). It is clear from the record that respondent-mother minimized or denied the risk respondent-father presented

to JF, and that respondent-mother had a history of withholding information related to other adults with potential access to a child living in her home. Although there was testimony that contradicted the case manager's testimony concerning JF's contact with respondent-father, the trial court was in a superior position to judge the credibility of the witnesses before it, and we do not find clear error in the trial court's decision to believe one witness over another. See *People v Farrow*, 461 Mich 202, 209; 600 NW2d 634 (1999).

The trial court did not clearly err by finding that at least one statutory ground for termination of respondent-mother's parental rights had been established by clear and convincing evidence. *Sanborn*, 337 Mich App at 275 n 5. Accordingly, we need not address the trial court's findings concerning additional grounds for termination. *Id.* at 272.

## IV. BEST-INTEREST DETERMINATION

Respondent-mother also argues that termination was not in JF's best interests because she shared a close bond with JF and had a stable home. We disagree.

Even if a statutory ground for termination exists, a trial court may not terminate parental rights unless doing so is in the child's best interests. *Olive/Metts*, 297 Mich App at 42. "Best interests are determined on the basis of the preponderance of the evidence." *In re LaFrance*, 306 Mich App 713, 733; 858 NW2d 143 (2014). "The trial court should weigh all the evidence available," including "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *White*, 303 Mich App at 713-714 (quotation marks and citation omitted). Other relevant factors include "the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *Id*. at 714.

The record shows that respondent-mother remained active in JF's life while he was in care, and that they shared a bond. However, despite this bond, the trial court held that termination was in JF's best interests, noting that JF had been in foster care for about a third of his life, from the age of four to six, and had significant special needs. His schools, therapists, and doctors were all in his foster community, and he had made great progress in his physical and behavioral health while in foster care. JF was in a preadoptive placement with a foster father who was a board-certified behavioral analyst trained in supporting children with autism. The foster father had formed a close bond with JF, and JF referred to him as "Daddy."

On this record, we are not left with a definite and firm conviction that the trial court made a mistake by holding that termination of respondent-mother's parental rights was in JF's best interests. There was evidence that respondent-mother actively interfered with the relationship between JF and her foster father. Respondent-mother's CPS case manager testified that JF would come back from parenting time and tell his foster father that "Mom says you're the devil" and "Mom told me that I can't love you. I can only love mom." The case manager also stated that respondent-mother had falsely accused the foster father of abuse and neglect. This history makes it doubtful, to say the least, that respondent-mother would work well with JF's current medical providers and caregivers to ensure a smooth transition of care and to best manage JF's special needs. Additionally, as stated, respondent-mother showed a marked lack of judgment when it

came to the risk posed by respondent-father to JF, and an unwillingness to provide petitioner with even the most basic information about a new relationship so that petitioner could determine whether JF was at risk. Based on the record, a reasonable inference would be that respondent-mother would be less able to manage JF's special needs and would be unable or unwilling to put her own feelings aside and prioritize JF's need for specialized support services. The trial court did not clearly err by holding that termination of respondent-mother's parental rights was in JF's best interests. *Olive/Metts*, 297 Mich App at 42.

Affirmed.


/s/ Christopher P. Yates
/s/ Mark T. Boonstra
/s/ Adrienne N. Young